## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

AMERICAN CHEMICAL SOCIETY
1155 16th Street NW
Washington, DC 20036,

ELSEVIER INC.
230 Park Avenue
New York, NY 10169,

ELSEVIER LTD.
The Boulevard, Langford Lane,
Kidlington, Oxford OX5 1GB,
United Kingdom,

and

ELSEVIER B.V.,
Radarweg 29
Amsterdam, 1043 NX,
Netherlands,

      Plaintiffs,

  v.

RESEARCHGATE GMBH
Invalidenstrasse 115
10115 Berlin, Germany,

      Defendant.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

**DEMAND FOR JURY TRIAL**

Plaintiffs, the American Chemical Society ("ACS") and Elsevier Inc., Elsevier Ltd., and Elsevier B.V. (collectively, "Elsevier"), for their Complaint against Defendant, ResearchGate GmbH ("ResearchGate"), allege, on personal knowledge as to matters relating to themselves, and on information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1.      This action arises from the massive infringement of peer-reviewed, published

journal articles ("PJAs").  Plaintiffs publish the articles in their journals and own the respective

copyrights.  Defendant deliberately uses infringing copies of those PJAs to drive its business.

2.      Founded in 1876, Plaintiff ACS is an internationally renowned professional and

scientific society.  It publishes over 50 peer-reviewed scientific journals, primarily in the field of

chemistry and related disciplines.  Founded in 1880, Plaintiff Elsevier is an international

multimedia publishing company.  Elsevier publishes hundreds of thousands of articles annually

in over 2,500 peer-reviewed journals it maintains.  Founded in 2008, Defendant ResearchGate is

a for-profit business that owns and operates an online social network and file sharing / download

service.  Each is aimed at scientists, researchers and related professionals and located on

ResearchGate's website at http://ResearchGate.net (the "RG Website").

3.      This lawsuit focuses on ResearchGate's intentional misconduct vis-à-vis its online

file-sharing / download service, where the dissemination of unauthorized copies of PJAs

constitutes an enormous infringement of the copyrights owned by ACS, Elsevier and other

journal publishers.  The lawsuit is not about researchers and scientists collaborating; asking and

answering questions; promoting themselves, their projects, or their findings; or sharing research

findings, raw data, or pre-prints of articles.

4.      ResearchGate's infringing activity is no accident.  Infringing copies of PJAs are a

cornerstone to ResearchGate's growth strategy.  ResearchGate deliberately utilizes the infringing

copies to grow the traffic to its website, its base of registered users, its digital content, and its

revenues and investment from venture capital.  ResearchGate knows that the PJAs at issue

cannot be lawfully uploaded to and downloaded from the RG Website.  Nevertheless, in

1

violation of the rights of ACS, Elsevier, and others, ResearchGate uploads infringing copies of PJAs and encourages and induces others to do so.  ResearchGate finds copies of the PJAs on the Internet and uploads them to computer servers it owns or controls.  In addition, ResearchGate lures others into uploading copies of the PJAs, including by directly asking them to do so, encouraging use of a "request full-text" feature, and misleadingly promoting the concept of "self-archiving."  ResearchGate is well aware that, as a result, it has turned the RG Website into a focal point for massive copyright infringement.

5.      ACS and Elsevier devote substantial creative efforts and financial resources in publishing and promoting their journals and the PJAs therein.  In particular, the peer review process is a crucial quality-control feature for scientific literature and advancement.  Through peer review, thousands of independent subject-matter experts selected by journal editors comment critically on publications under consideration, helping ensure the publication of important, high quality articles and avoid publication of faulty, incomplete, unreliable or misleading results.  Managing and coordinating the peer review process, along with enriching and promoting the final publication in myriad other ways, is time-consuming, resource-intensive, and demanding.

6.      ACS, Elsevier and other publishers have updated their policies and worked collaboratively with others to ensure that scientists and researchers can share quickly, easily and responsibly, including as it concerns peer-reviewed PJAs.  ResearchGate, however, persists in engaging in, promoting, and exploiting vast infringement that jeopardizes the sustainability of peer-reviewed articles and their dissemination via journal publications, which have proven vital to advancing science.  ResearchGate's misconduct also jeopardizes the coherence and integrity of the scientific record, which ACS and Elsevier, as the publishers of the articles and stewards of

the scientific literature, diligently maintain and preserve.  ACS and Elsevier thus bring this action to end ResearchGate's ongoing infringement and remedy the harm ResearchGate has caused, which is ongoing.

## JURISDICTION AND VENUE

7.    This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this is a civil action arising under the Copyright Act, 17 U.S.C. §§ 101 *et seq*.

8.    This Court has personal jurisdiction pursuant to Md. Code Ann., Courts & Jud. Proc. 6-103.  ResearchGate has engaged in substantial activities purposefully directed at Maryland and the claims asserted herein arise from and relate to those extensive contacts.  Among other things, in furtherance of the infringing activity complained of herein, ResearchGate has deliberately, knowingly, and systematically created online profiles of Maryland residents, online profiles of companies and institutions based in Maryland, and online profiles of articles written by Maryland residents and published in the journals of ACS, Elsevier and others.  ResearchGate has sent emails and other messages to Maryland residents in an effort to recruit them to sign up for access to the RG Website, the focal point of the infringement complained of herein, as well as upload or endorse ResearchGate's prior copying of the full-text of articles published in journals of ACS, Elsevier and others.  As ResearchGate intended and is aware, its misconduct complained of herein has caused substantial unauthorized uploading to and downloading from the RG Website of unauthorized copies of PJAs, including by Maryland residents.  ResearchGate has also knowingly solicited companies and institutions in Maryland to pay for the RG Website's advertising and recruiting services, profited from the display of advertising on the RG Website to Maryland residents, and made prominent use of Maryland-based Johns Hopkins University's name to solicit customers.  In the alternative, personal jurisdiction in this district exists under the federal

3

long-arm statute, Fed. R. Civ. P. 4(k)(2).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. §

1400(a), because a substantial part of the acts of infringement, and other events and omissions

complained of herein occur, or have occurred, in this district, and this is a district in which

ResearchGate resides or may be found.

10.     Maryland's position as a central locus of science and research gives it a unique

interest in this litigation.  Maryland is a major center of science and research.  Maryland is home

to some of this nation's leading universities, medical centers, and scientific, engineering and

research institutions.  Plus, Maryland is home to more than 500 biotechnology companies and

more than 2,300 life sciences companies, as well as 15 of the top 20 aerospace and defense

companies.  Maryland ranks first among states in jobs concentrated in the science, technology,

engineering, and mathematics fields.

## THE PARTIES

11.     Plaintiff ACS is a section 501(c)(3), non-profit organization, with its principal

place of business at 1155 16th Street NW, Washington, DC 20036.  ACS became a federally

chartered corporation by an act of Congress in 1937.  *See* 36 U.S.C. §§ 20501 - 20505.

12.     Plaintiff Elsevier Inc. is a corporation organized under the laws of the State of

Delaware, with its principal place of business at 230 Park Avenue, New York, NY 10169.

13.     Plaintiff Elsevier Ltd. is a corporation organized under the laws of the United

Kingdom with its registered office at The Boulevard, Langford Lane, Kidlington, Oxford OX5

1GB, United Kingdom.

14.     Plaintiff Elsevier B.V. is a corporation organized under the laws of the

Netherlands, with its registered office at Radarweg 29, Amsterdam, 1043 NX, Netherlands.

4

15.     Defendant ResearchGate GmbH is a company organized under the laws of Germany, with its principal place of business in Berlin.

### PLAINTIFFS ACS AND ELSEVIER

16.     Founded in 1876 by thirty-five chemists meeting at the College of Pharmacy of the City of New York, ACS is the world's largest scientific society.  To further its mission, "to advance the broader chemistry enterprise and its practitioners for the benefit of Earth and its people," ACS publishes numerous scientific journals and databases, convenes major research conferences, and provides educational, science policy and career programs in chemistry.  ACS began publishing chemical research with the *Journal of the American Chemical Society* in 1879.  Today, ACS publishes over 50 peer-reviewed journals with cutting-edge articles across a broad spectrum of scientific disciplines, stretching across chemistry, physics, and biology.  Every year, approximately 150,000 authors and their research teams from the community of scientists worldwide submit their work to these journals.  ACS journals are available to over 150,000 ACS members and at more than 5,000 academic, business and corporate institutions worldwide.  In 2017, there were roughly 105 million authorized full-text downloads of the articles published in ACS journals.  Besides publishing new journals, ACS maintains a legacy archive that provides full-text searching and instant access to all titles, volumes, issues, and articles published by ACS dating back to 1879.  This collection includes nearly a half million articles from the most-cited journals in chemistry and beyond, including the work of 180 Nobel Laureates.

17.     Founded in 1880, Elsevier takes its name from the publishing house of Elzevir, a venerable publishing house that dates back to the year 1580.  The Elzevir printer's mark that is still used as Elsevier's logo today features an elderly man standing beneath a vine-entwined elm tree



**ELSEVIER**

under which is inscribed the Latin term *Non Solus* (not alone).  The message is as apt today as it was hundreds of years ago, showing the symbiotic relationship between publisher and scholar. The *Non Solus* inscription reinforces the message that publishers, like the elm tree, provide sturdy support for scholars, just as surely as scholars, the vine, produce fruit.  Publishers and scholars cannot do it alone.  They need each other.  The fruits of the collaboration between Elsevier and the eclectic group of scientific visionaries it has published—ranging from Albert Einstein to Stephen W. Hawking to scores of Nobel Laureates—are obvious.  Indeed, Elsevier journals have featured articles by all but one of the science and economics Nobel Laureates since the year 2000.  During 2017, more than 1.6 million research papers were submitted to Elsevier, resulting in the publication, following peer review, of over 430,000 articles.  In 2017, there were over 900 million authorized full-text downloads of those articles.

18.     Since the beginning of ACS' and Elsevier's existence in the late 1800s, how the world shares information has constantly changed.  ACS and Elsevier have always anticipated and adapted themselves to that change, finding ways to play an integral role in the progression of knowledge and creativity.  As journal publishers, ACS and Elsevier undertake a variety of activities to advance science, including the time, efforts and investments of: detecting and cultivating areas that require a journal; developing and connecting with an audience for publications in that field; soliciting materials; reviewing submissions; accepting and rejecting submissions; detecting plagiarism; identifying ethical issues; managing the peer-review process; editing and proofreading; providing staff for substantive editing; attending to design, formatting and layout; improving illustrations; assisting in researcher compliance with funder and institutional access policies; marketing the articles via search engines, social media, and elsewhere; tagging the article components to generate useful metadata; tracking and reporting

usage metrics; depositing articles and data to broaden access; tracking and integrating new standards, whether technical, governmental, institutional; and maintaining platforms for hosting and delivering the articles safely and effectively.  Scientists and researchers rely upon ACS and Elsevier performing such services, as it allows them to make the most of their limited time for professional reading, research, and collaboration.

19.     As scientists, researchers, and others have desired different ways to publish and share articles quickly and easily, ACS and Elsevier have responded with new solutions.  One important example is that ACS and Elsevier publish journals today that are subscription, open-access, or a hybrid between the two.  Articles under each type of journal are peer-reviewed and available in various formats including online at ScienceDirect (http://ScienceDirect.com), Elsevier's platform of peer-reviewed scholarly literature, or at ACS Publications (http://pubs.acs.org), ACS' website of peer-reviewed scholarly literature.  Another important example is that the sharing policies of ACS and Elsevier are flexible and comprehensive and strike a crucial balance between supporting authors' sharing of their articles and research in myriad ways and sustaining journals financially.

20.     How authors can share their articles depends on the version of the article.  For instance, a "preprint" is the author's initial write-up of research results and analysis that has not been submitted to a journal, peer-reviewed, or had any other value added to it by a publisher. Generally speaking, the author of an article published in the journals of ACS and Elsevier can share their preprint anywhere with anyone at any time.  A PJA, which is also referred to as a "version of record" ("VOR"), is the definitive final record of published research that appears or will appear in the journal and embodies all value-adding publisher activities including peer review coordination, copyediting, formatting, and other enrichment.  Generally speaking, the

author of an article published in the journals of ACS or Elsevier can use their PJA for many purposes, including their own classroom teaching, presentations at meetings and conferences, and distribution to colleagues in private settings such as email. Notably, however, uploading PJAs of the type at issue in this action to a third-party commercial website (*e.g.*, the RG Website) is strictly prohibited and unauthorized.

21. When ACS and Elsevier accept articles for publication in their peer-reviewed journals, the authors transfer copyright ownership of the PJA to ACS or Elsevier through a signed written agreement. Accordingly, ACS and Elsevier are the copyright owners or owners of exclusive rights (by way of signed written agreement) in*, inter alia*, those PJAs listed on Exhibit A (hereinafter, "Plaintiffs' Works"). Plaintiffs' Works listed on Exhibit A constitute original works and copyrightable subject matter pursuant to the Copyright Act and are protected by registrations duly issued by the United States Copyright Office, as listed on the exhibit. Under the Copyright Act, ACS and Elsevier have the distinct, severable, and exclusive rights to, among other things, reproduce the copyrighted works, display the copyrighted works publicly, distribute copies of the copyrighted works to the public, as well as to authorize such activities. 17 U.S.C. § 106. Exhibit A is illustrative, not exhaustive.

**DEFENDANT RESEARCHGATE AND ITS ACTIVITIES**

22. In egregious violation of copyright law, ResearchGate provides anyone connected to the Internet with a free trove of infringing digital copies of peer-reviewed published journal articles. ResearchGate has consciously designed and actively maintains the RG Website as a hub for obtaining infringing copies of those PJAs. ResearchGate is not a passive host of a forum where infringement just happens to occur. Rather, ResearchGate actively participates in the ongoing infringement, in which it directly engages by duplicating, displaying, and distributing

unauthorized copies of PJAs.  ResearchGate also intentionally facilitates, supports, and lures

users into uploading and downloading unauthorized copies of PJAs.  ResearchGate's motive is

simple.  Its business model critically relies on the viral growth of its file sharing / download

service.  ResearchGate knows that copies of PJAs from journals attract and retain users.  Thus,

ResearchGate uses unauthorized copies of the PJAs to grow the traffic to its website, its base of

registered users, the content on its site, and its revenues and investment from venture capital.

ResearchGate knows exactly what is happening on its site and facilities, but it deliberately

causes, and refrains from stopping, the infringement.

### The RG Website

23.     The RG Website is an English-language social networking and file-sharing /

download service for scientists, researchers, and others.  It is a highly interactive, integrated

online service that displays profiles of researchers and scientists, enables them to ask and answer

questions and make connections, and provides access to a free digital library with unauthorized

copies of PJAs and other content.  The United States is ResearchGate's biggest market.  More

individuals visit the RG Website from the United States than from any other country.

24.     Massive amounts of the content uploaded to and downloaded from the RG

Website, including by Maryland residents and within this district, consists of unauthorized copies

of copyright-protected PJAs.  In one study, for instance, a researcher examined a random sample

of 392 non-open access English-language journal articles on the RG Website and conservatively

concluded that 51.3% of them were infringing copies of the PJA.  *See* Hamid R. Jamali,

*Copyright Compliance and Infringement in ResearchGate Full-text Journal Articles*, 112

SCIENTOMETRICS 1 (2017) at 252.

25.     ResearchGate makes it easy for individuals to find, access, download and share

copyrighted articles.  An account with the RG Website is required to maintain a profile, ask or answer questions, upload documents, or request the author to upload an article.  To obtain an account, a person must register using an email address at a recognized institution or be manually confirmed by ResearchGate as a published scientist or researcher.  On the other hand, anyone connected to the Internet can freely access the PJAs and other content posted on the RG Website.

26.     When ResearchGate or a user uploads a copy of a PJA, the file is reproduced onto computer servers that ResearchGate owns or controls, where it is stored and available for other users of the service to access.  With just a few keystrokes, anyone can find the PJAs using a search interface on the RG Website.  Likewise, with just a few keystrokes, the PJAs can be found by querying a search engine such as Google, which delivers links to the pertinent webpages on the RG Website.

27.     Anyone can read the PJAs on the RG Website, where ResearchGate displays copies for viewing.  The RG Website also has a "Download full-text" button that allows anyone to download a copy of a PJA as a PDF file.  When this happens, ResearchGate distributes a PDF to the user through the RG Website.  Further, the RG Website has a "share" function that promotes circulating links to the RG Website's copy of the PJA through Facebook, Twitter, LinkedIn, Google+, and Reddit.

**Intentional Infringement**

28.     ResearchGate amasses content via "scraping" (copying content off websites, including ones in the United States) that targets journal articles protected by copyright. ResearchGate has copied PJAs from websites and then uploaded those copies to the RG Website for users to access, view and download.

10

29.     Until relatively recently, ResearchGate's scraping was reflected where the RG Website publicly displayed a multi-page preview of the article, along with a button for a user to "Request full-text."  In such circumstance, if a user selected the "Request full-text" prompt, ResearchGate then would present an individual who ResearchGate believed to be the author with what it calls a "One-Click Upload," an "Import," or something similar, telling the purported author, for instance, that ResearchGate has located "YOUR FULL-TEXTS ONLINE" and that someone has requested a copy of the PJA.  Alternatively, ResearchGate would go directly to the individual who ResearchGate believes is the author and ask the author to endorse the public posting of the article that ResearchGate already found online and copied. Yet ResearchGate asking the user to "Upload" or "Import" the file onto the RG Website is a misnomer.  ResearchGate has already copied the PJA from the third-party site onto computer servers it owns or controls.  The putative author clicking "upload" or "import" (or something similar) merely changes the status of the file that ResearchGate already copied to its servers so that others can access and download the full-text rather than just the multi-page preview.

30.     Besides such features, ResearchGate has alluded to its own copying in other ways.  On the RG Website, ResearchGate indicates (emphasis in bold): "Proprietary content **generally** appears on ResearchGate only when it has been uploaded by an author. So, if there's already a full-text of your publication available on ResearchGate, the **most likely explanation** is that it has been uploaded by one of your co-authors."  Further, a prior job posting for a position at ResearchGate indicated ResearchGate's desire to hire someone with "hands-on experience in building and maintain web crawlers" to "build web crawlers to discover and index university websites"—an antecedent step to indexing and copying PJAs.

11

31.     Others too have recognized ResearchGate's unauthorized copying.  One
academic study concluded that, for the full-text English-language articles on ResearchGate in
its sample, 14% apparently were attributable to copying performed by ResearchGate, facilitated
through its crawling activity, rather than uploads by authors/users.  *See* Hamid R. Jamali,
*Copyright Compliance and Infringement in ResearchGate Full-text Journal Articles*, 112
SCIENTOMETRICS 1 (2017) at 251.  Moreover, authors have stated publicly that ResearchGate
has copied PDFs of articles from authors' personal websites, expressing surprise when they see
their articles on the RG Website.

### Facilitation of Infringement

32.     ResearchGate encourages, induces and causes users to upload copies of peer-
reviewed PJAs to the RG Website, as well as other copyright-protected materials such as
conference proceedings.  ResearchGate employs a variety of techniques to cause users to
upload unauthorized copies of PJAs or endorse its prior copying of such articles.

33.     For instance, on the RG Website, as well as in communications to users,
ResearchGate displays the following sorts of upload prompts to scientists and researchers:



In the first column, entitled "Peer-Reviewed," ResearchGate overtly encourages users to upload
"peer-reviewed research, such as articles and conference proceedings."

34.     Even more directly, ResearchGate solicits specific authors to upload copies of specific PJAs that ResearchGate knows are published in journals whose terms do not allow such posting.  ResearchGate structures the RG Website around a vast index that it compiles of PJAs.  Three of the primary types of pages within this index on the RG Website are "profile pages," "publication pages," and "journal pages."  The latter two categories directly target the journals of ACS, Elsevier and others and the PJAs therein.

35.     Created by ResearchGate or a user, the profile page is a page on the RG Website that features a particular scientist or researcher.  It can contain information such as the person's education, employment, interests and projects.  It also has a publication index with links to the associated pages on the RG Website for the person's publications, including copies of their PJAs.

36.     The publication page is a page on the RG Website that corresponds to a specific article, to which multiple PDF files, including a copy of a PJA, may be attached.  Similar to profile pages, ResearchGate creates many of the publication pages itself, without any involvement from the publication's author.  ResearchGate creates the publication pages by copying abstracts of countless published articles from literature databases, including PubMed (National Institute of Health), CiteSeer, and other websites in the United States.

37.     As ResearchGate creates publication pages, it knows when the article is published under terms that prohibit posting the article on a commercial site like the RG Website.  ResearchGate is aware of this based on: its knowledge of the industry; its communications with publishers; its review of journal publishers' websites; and via other means such as the SHERPA/RoMEO database (http://www.sherpa.ac.uk/romeo), a popular tool that summarizes publishers' policies on use of journal articles, which ResearchGate implements

directly in each publication page.  Nevertheless, ResearchGate selects particular articles, copies those PJAs from websites, and then stores the copies on its servers without authorization. ResearchGate also prompts specific authors, including via email to researchers and scientists within Maryland and this district, to upload copies of specific PJAs from specific journals that it targets.  Once a copy of the PJA is uploaded to the RG Website, ResearchGate publicly displays a rendering of the full PJA on the publication page with which it is associated and provides a download button that can be used to download a copy of the PJA as PDF file.

38.     The journal page is a webpage on the RG Website that profiles a specific journal, followed by abstracts and, if available, links to RG publication pages with copies of PJAs from the journal.  The journal pages substitute for the journals' own websites in the key aspect of indexing and offering PJAs and effectively are unauthorized shadow versions of the journals own websites.  ResearchGate targets ACS and Elsevier journals specifically in this way.  Someone interested in an Elsevier or ACS journal can go to the journal page on the RG Website to access articles from that journal, listed in chronological order.  If ResearchGate only has the abstract for the PJA, rather than the PJA itself, the "Request full-text" feature on each publication page allows the user to ask the author to upload a copy of the PJA.  When the author fulfills one of these requests, unless the responding author makes the effort to provide a copy only privately, the article is automatically posted publicly on the RG Website. ResearchGate engages in this activity despite knowing that the terms from ACS, Elsevier and other publishers prohibit posting PJAs onto a commercial site like the RG Website.

39.     ResearchGate consistently and successfully attempts to encourage and trick authors into uploading copies of PJAs that it knows should not be posted on the RG Website. One tactic is the combination of creating author profiles, publication pages, and journal pages,

14

along with the "Request full-text" feature.  Another is that ResearchGate sends emails to specific authors, including those located in Maryland, asking them to upload copies of specific PJAs to the RG Website.  As well, ResearchGate misinforms users, including many Maryland residents, of the meaning and application of "self-archiving."

40.     As a ploy to obtain unauthorized copies of PJAs, ResearchGate presents researchers and scientists with false and misleading statements about self-archiving. ResearchGate tells them that they can self-archive on the RG Website by "uploading full-text versions" of publications so that the document is publicly accessible online.  ResearchGate further tells researchers and scientists that a "green" Sherpa/RoMEO classification color means that the full-text of the article can be uploaded without infringing publishers' copyrights.  But, as ResearchGate is fully aware, the policies of ACS, Elsevier, and most other journal publishers do not permit uploading the PJAs to a commercial site like ResearchGate.

41.     Where a journal allows self-archiving, the version that can be archived is not the PJA.  In fact, one study concluded that, for 99.3% of journal articles, the publisher's policy did not permit displaying the published version.  *See* Mikael Laakso, *Green Open Access Policies of Scholarly Journal Publishers: A Study of What, When, and Where Self-Archiving is Allowed*, 99 Scientometrics 2 (2014) at 10.  ResearchGate knows this and has acknowledged that author agreements with publishers generally assign the copyright to the article to the publisher and that the PJAs usually cannot be posted publicly.  Nevertheless, under the false premise that it is lawful "self-archiving," ResearchGate encourages users to upload copies of PJAs.

42.     ResearchGate's early promotional statements are telling about its culpable intent and how it purposely and actively has brought about infringement ever since. ResearchGate described its "self-archiving repository" as a "way for researchers to access

15

millions of publications in their full version online" and that it will become "an enormous pool" of free research for ResearchGate's members.  ResearchGate falsely told authors that "nine out of ten journals allow self-archiving" and that therefore, "each user can upload his or her published articles in compliance with self-archiving regulations."

### Financial Interest in the Infringement

43.     ResearchGate has a strong financial interest in the infringing activity.  The infringing copies of PJAs are a fast and easy means for ResearchGate to grow its user base, attracting those joining a scientific social network for the first time and those transitioning away from another service.  The infringing files draw and retain users, as well as more content, thereby compounding the financial benefits to ResearchGate.

44.     For instance, when a visitor to the RG Website shows interest in a PJA that is not yet publicly accessible on the RG Website, ResearchGate lures both an unauthorized copy of the PJA and a new user.  In such circumstance, ResearchGate tells the user (emphasis added in bold): "**Want to access a full-text version of this publication? . . . The authors of [this article] are on ResearchGate but haven't yet made the full-text available for download. Sign up for a free account to request a full-text version of it – millions of other researchers have already uploaded theirs.**"  This leads the visitor to register and induces the author to upload a copy of the PJA, leading to an infringing upload and a new user, both of which advance ResearchGate's financial interests.

45.     The greater the number of users, along with the increased content, the more valuable the RG Website is to users and the less interest users have in maintaining a profile elsewhere.  This "network effect" from the infringing activity directly advances ResearchGate's financial interests.  Indeed, each of ResearchGate's revenue streams depends upon the PJAs,

website visitors, and registered user base that it amasses by exploiting the infringing activity for its commercial benefit.

46.     One of ResearchGate's revenue streams is paid advertising on the RG Website for third parties' products and services, as well as conferences.  Paid advertisements appear, for example, on author pages, journal pages, and publication pages that list, link to and often contain the infringing copies of full-text articles.  Another one of ResearchGate's revenue streams involves recruiting advertisements, where employers pay $499 to run a single job advertisement on the RG Website for 30 days.  ResearchGate's revenue from these advertising and recruiting services, which it has directed to companies, institutions, and individuals in the United States, including in Maryland, is critically dependent on the base of PJAs, website visitors and registered users brought from the infringement.  ResearchGate deploys infringing PJAs to create a loop that drives its business growth.  The more infringing content ResearchGate provides, the more users it attracts; the more users it attracts, the more opportunities it has to induce new uploads of infringing copies of PJAs, thereby attracting even more users.  This cycle fuels ResearchGate's advertising and recruiting services revenue.

47.     ResearchGate's corporate valuation also depends heavily on the infringing activity.  Metrics such as website traffic, registered users, content growth, and the like attract venture capital investors, including those that have already fueled ResearchGate with over $100 million.  For the RG Website, the infringing activity furthers each of those key factors.

**Attempts to Resolve**

48.     Before commencing this action, ACS, Elsevier, and other publishers repeatedly encouraged ResearchGate to operate the RG Website within the law.  Working through a trade group called the International Association of Scientific Technical and Medical Publishers

17

("STM"), ACS and Elsevier encouraged ResearchGate to endorse STM's Voluntary Principles for Article Sharing on Scholarly Collaboration Networks.  More than fifty organizations, including ACS and Elsevier, have endorsed these principles in the hope of making sharing of content simple and seamless for scientists and researchers while enhancing collaboration and respecting the access and usage rights that govern the articles.  Though rejected by ResearchGate, a number of scientific social networks have endorsed the voluntary principles.

49.    With ResearchGate unwilling to operate lawfully, several of the world's leading publishers, including ACS and Elsevier, also formed the Coalition for Responsible Sharing. Today, the coalition has over one dozen publishers, including ACS, the American Medical Association, the American Physiological Society, Atlantis Press, BMJ, Brill, Elsevier, Future Science Group, IEEE, IWA Publishing, Oxford University Press, Portland Press (wholly-owned by the Biochemical Society), Wiley, Wolters Kluwer, and World Scientific Publishing. In October 2017, ACS and Elsevier brought suit against ResearchGate in Germany for its misconduct in Germany in violation of German law.  ACS, Elsevier and other coalition members also have been sending takedown notices to ResearchGate regarding specific infringing files on the RG Website.  Of course, ResearchGate already knows of the specific infringing files and has an obligation to remove them even without receiving a notice.

50.    ResearchGate is responsible for its own infringing activities and has the full right and ability to stop or limit the infringements by users occurring on its service. ResearchGate could stop duplicating and distributing the infringing copies of PJAs.  It also could stop encouraging, inducing and causing the infringements.  There are simple measures that ResearchGate can take to prevent or limit the infringements by others.  Among the available means, Research could meaningfully inform users as to the infringing activity, in

18

order to deter it.  ResearchGate could utilize technology that detects and limits the infringing

activity.  ResearchGate could enforce the Terms of Service for the RG Website, where it

reserves the right to delete uploads, issue warnings, and suspend or terminate a user's access.

ResearchGate controls who can upload materials to the RG Website.  It also monitors use of the

RG Website.  ResearchGate acts when it deems it in its interests to do so.  The infringing

activity and specific infringements are readily apparent to anyone, including ResearchGate.  It

sees the PJAs, including those bearing logos and copyright notices that make the infringement

obvious.  Yet, because the infringing activity is central to its business model, ResearchGate has

chosen not to prevent or limit it.

51.     As a result of the coalition's efforts, ResearchGate has removed from public

view (at least temporarily) a significant number of infringing copies of PJAs.  ResearchGate

has not shared any information about what it removed or why, or the present status of the

infringing copies.  It is clear though that the infringing activity remains rampant.

**Harm**

52.     ResearchGate's misconduct has caused and continues to cause harm to ACS,

Elsevier and many others.  Search engine query results for the title of a PJA typically include

the publication page on the RG Website among the highest-ranked results; in such

circumstance, the infringing file on the RG Website directly competes with and displaces

lawful channels for accessing the article.  ACS and Elsevier suffer serious financial and

reputational injury when their copyrights and exclusive rights under copyright are infringed.  A

substantial decline in revenue from these works could force ACS or Elsevier to cease

publishing one or more additional works or journals.  It also could strain the ability of ACS or

19

Elsevier to ensure that articles remain discoverable and accessible.  This would adversely impact the creation of new works, scholarly endeavor, and scientific progress.

53.     ResearchGate's infringing activity also damages the integrity of the scientific record.  ResearchGate's blending of unauthorized copies of peer-reviewed articles with various other versions and content can cause confusion and obfuscate the scientific record.  For instance, a scientist, researcher or healthcare professional accessing a copy of the PJA on the RG Website—instead of on ScienceDirect or the ACS platform—will not necessarily be aware of corrections, retractions, updates, and linked information such as research data.  Likewise, content on the RG Website is often presented in combination with other data and drafts, potentially making it unclear to readers whether they are looking at the latest, peer-reviewed version of the article.  ResearchGate exacerbates those risks where it has replaced the original hyperlinks within the PJAs with links to publication pages on the RG Website, as well as removing or failing to maintain the metadata within the files.  The resulting confusion can hinder sound decision-making and novel contributions to research.  In the case of medical research and health care delivery, there can be serious consequences for treatment decisions and patient-care outcomes.

## FIRST CLAIM FOR RELIEF
### (Direct Copyright Infringement)

54.     ACS and Elsevier re-allege and incorporate by reference the allegations set forth above in paragraphs 1-53.

55.     ResearchGate, without permission or consent of ACS or Elsevier, has made unauthorized reproductions of Plaintiffs' Works, including, but not limited to, works listed in Exhibit A hereto.  ResearchGate, without permission or consent of ACS or Elsevier, also has made unauthorized distributions to the public and unauthorized public displays of Plaintiffs'

Works, including, but not limited to, works listed in Exhibit A hereto.  ResearchGate's conduct constitutes direct infringement of the exclusive rights of ACS and Elsevier under the Copyright Act in violation of 17 U.S.C. §§ 106(1), (3), and (5).

56.     Each infringement of the rights of ACS or Elsevier in one of Plaintiffs' Works constitutes a separate and distinct act of infringement.

57.     ResearchGate's unlawful conduct, as set forth above, is willful, intentional and purposeful, in reckless disregard of and indifference to ACS' and Elsevier's rights.

58.     ResearchGate's actions described above have caused and will continue to cause irreparable damage to ACS and Elsevier, for which they have no remedy at law.  Unless this Court restrains ResearchGate from continuing its infringement of ACS' and Elsevier's copyrights, these injuries will continue to occur in the future.  Pursuant to 17 U.S.C. § 502, ACS and Elsevier are accordingly entitled to injunctive relief restraining ResearchGate from further infringement.

59.     As a direct and proximate result of ResearchGate's infringement, ACS and Elsevier are entitled to up to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of up to $150,000 with respect to each work infringed.  Alternatively, at the election of ACS and Elsevier, pursuant to 17 U.S.C. § 504(b), they shall be entitled to their actual damages plus ResearchGate's profits from infringement, as will be proven at trial.

60.     ACS and Elsevier are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## SECOND CLAIM FOR RELIEF
### (Inducement of Copyright Infringement)

61.     ACS and Elsevier re-allege and incorporate by reference the allegations set forth above in paragraphs 1-53.

21

62.     As set forth herein, users have uploaded to and downloaded from the RG Website unauthorized copies of Plaintiffs' Works, in violation of the exclusive rights of ACS and Elsevier to reproduce and distribute those works, including, but not limited to, the works listed in Exhibit A.  The scope of this infringement is enormous.

63.     ResearchGate is liable under the Copyright Act for inducing the direct infringements described above.  ResearchGate operates its file sharing / download service with the object of promoting its use to infringe the copyrights of ACS, Elsevier and others.

64.     ResearchGate's inducement of copyright infringement is obvious from, among other things:  (a) ResearchGate's attempt to attract users and revenue by assembling an easily searchable and accessible library of infringing copies of PJAs; (b) ResearchGate's structuring its file sharing / download service around unauthorized copies of PJAs, including even creating webpages targeting specific PJAs and the journals in which they appear; (c) ResearchGate's uploading unauthorized copies of PJAs; (d) ResearchGate's use of a "Request full-text" feature for one stranger to ask another stranger to upload a copy of a PJA that ResearchGate knows cannot be copied lawfully onto its commercial service for unlimited downloading; (e) ResearchGate's misleading statements encouraging the infringement, including under the false premise that it is lawful self-archiving; (f) ResearchGate's emails and messages to users prompting infringing uploads; (g) ResearchGate's failure to use available means to limit the widespread infringement; and (h) ResearchGate's targeting of advertising to infringing files and users thereof.  Through these activities, among others, ResearchGate knowingly and intentionally entices, persuades, and causes users of the RG Website to upload and download, without authorization, the copyrighted journal articles of ACS and Elsevier, including but not limited to, those listed in Exhibit A hereto.

22

65.     Each infringement of the rights of ACS or Elsevier in one of Plaintiffs' Works constitutes a separate and distinct act of infringement.

66.     ResearchGate's unlawful conduct, as set forth above, is willful, intentional and purposeful, in reckless disregard of and indifference to ACS' and Elsevier's rights.

67.     ResearchGate's actions described above have caused and will continue to cause irreparable damage to ACS and Elsevier, for which they have no remedy at law.  Unless this Court restrains ResearchGate from continuing its infringement of ACS' and Elsevier's copyrights, these injuries will continue to occur in the future.  Pursuant to 17 U.S.C. § 502, ACS and Elsevier are accordingly entitled to injunctive relief restraining ResearchGate from further infringement.

68.     As a direct and proximate result of ResearchGate's infringement, ACS and Elsevier are entitled to up to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of up to $150,000 with respect to each work infringed.  Alternatively, at the election of ACS and Elsevier, pursuant to 17 U.S.C. § 504(b), they shall be entitled to their actual damages plus ResearchGate's profits from infringement, as will be proven at trial.

69.     ACS and Elsevier are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

### THIRD CLAIM FOR RELIEF
**(Contributory Copyright Infringement)**

70.     ACS and Elsevier re-allege and incorporate by reference the allegations set forth above in paragraphs 1-53.

71.     As set forth herein, users have uploaded to and downloaded from the RG Website unauthorized copies of Plaintiffs' Works, in violation of the exclusive rights of ACS

and Elsevier to reproduce and distribute those works, including, but not limited to, the works listed in Exhibit A.  The scope of this infringement is enormous.

72.     ResearchGate is liable as a contributory copyright infringer for the direct infringements described above.  ResearchGate has actual and constructive knowledge of the infringing activity and specific infringements that occur when users upload to and download from the RG Website unauthorized copies of PJAs, including, but not limited to, Plaintiffs' Works listed within Exhibit A.  Nevertheless, ResearchGate knowingly encourages, causes and materially contributes to such unauthorized uploading and downloading of those works. ResearchGate therefore is contributorily liable for the unauthorized reproduction and distribution of those works.

73.     Each infringement of the rights of ACS or Elsevier in one of Plaintiffs' Works constitutes a separate and distinct act of infringement.

74.     ResearchGate's unlawful conduct, as set forth above, is willful, intentional and purposeful, in reckless disregard of and indifference to ACS' and Elsevier's rights.

75.     ResearchGate's actions described above have caused and will continue to cause irreparable damage to ACS and Elsevier, for which they have no remedy at law.  Unless this Court restrains ResearchGate from continuing its infringement of ACS' and Elsevier's copyrights, these injuries will continue to occur in the future.  Pursuant to 17 U.S.C. § 502, ACS and Elsevier are accordingly entitled to injunctive relief restraining ResearchGate from further infringement.

76.     As a direct and proximate result of ResearchGate's infringement, ACS and Elsevier are entitled to up to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of up to $150,000 with respect to each work infringed.  Alternatively, at the

election of ACS and Elsevier, pursuant to 17 U.S.C. § 504(b), they shall be entitled to their actual damages plus ResearchGate's profits from infringement, as will be proven at trial.

77.     ACS and Elsevier are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## FOURTH CLAIM FOR RELIEF
### (Vicarious Copyright Infringement)

78.     ACS and Elsevier re-allege and incorporate by reference the allegations set forth above in paragraphs 1-53.

79.     As set forth herein, users of the RG Website upload to and download from the RG Website unauthorized copies of Plaintiffs' Works, in violation of the exclusive rights of ACS and Elsevier to reproduce and distribute those works, including, but not limited to, the works listed on Exhibit A.  The scope of this infringement is enormous.

80.     ResearchGate is liable as a vicarious copyright infringer for the direct infringements described above.  ResearchGate has the legal and practical right and ability to supervise and control the infringing activities that occur through the use of the RG Website, and at all relevant times has had a financial interest in, and derived direct financial benefit from, the infringing use of the RG Website.  ResearchGate has refused to take reasonable steps to prevent the widespread infringement.  ResearchGate is therefore vicariously liable for the unauthorized reproduction and distribution of Plaintiffs' Works, including but not limited to those listed in Exhibit A hereto.

81.     Each infringement of the rights of ACS or Elsevier in one of Plaintiffs' Works constitutes a separate and distinct act of infringement.

82.     ResearchGate unlawful conduct, as set forth above, is willful, intentional and purposeful, in reckless disregard of and indifference to ACS' and Elsevier's rights.

83.     ResearchGate's actions described above have caused and will continue to cause irreparable damage to ACS and Elsevier, for which they have no remedy at law.  Unless this Court restrains ResearchGate from continuing its infringement of ACS' and Elsevier's copyrights, these injuries will continue to occur in the future.  Pursuant to 17 U.S.C. § 502, ACS and Elsevier are accordingly entitled to injunctive relief restraining ResearchGate from further infringement.

84.     As a direct and proximate result of ResearchGate's infringement, ACS and Elsevier are entitled to up to the maximum statutory damages, pursuant to 17 U.S.C. § 504(c), in the amount of up to $150,000 with respect to each work infringed.  Alternatively, at the election of ACS and Elsevier, pursuant to 17 U.S.C. § 504(b), they shall be entitled to their actual damages plus ResearchGate's profits from infringement, as will be proven at trial.

85.     ACS and Elsevier are entitled to their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, ACS and Elsevier pray for judgment from this Court as follows:

1.     A declaration that ResearchGate has committed willful copyright infringement;

2.     An order enjoining ResearchGate and its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with each or any of them, from directly or indirectly reproducing, distributing, displaying, or otherwise infringing, or causing, enabling, facilitating, encouraging, or inducing the reproduction, distribution, display, or other infringement of, any of the respective copyrights owned or exclusively controlled, in whole or in part, by ACS or Elsevier, whether now in existence or hereinafter created;

26

3.      An order requiring ResearchGate to deliver up for destruction, including deletion off ResearchGate's computer servers and other devices, all unauthorized copies of works for which ACS or Elsevier owns or exclusively controls the copyrights, in whole or in part;

4.      Statutory damages pursuant to 17 U.S.C. § 504(c), in an amount up to the maximum provided by law, arising from ResearchGate's willful infringement. Alternatively, at ACS' and Elsevier's election pursuant to 17 U.S.C. § 504(b), actual damages, including ResearchGate's profits from infringement, as will be proven at trial;

5.      An award of costs in this action, including the reasonable attorneys' fees of ACS and Elsevier, pursuant to 17 U.S.C. § 505;

6.      Pre-judgment and post-judgment interest at the applicable rate on any monetary award made part of the judgment against ResearchGate; and

7.      Such other and further relief as the Court deems proper

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, ACS and Elsevier hereby demand a trial by jury of all issues that are so triable.

DATED: October 2, 2018             Respectfully submitted,

By:   */s/ Scott Zebrak*
Scott A. Zebrak (Bar Number 17741)
Corey Miller
OPPENHEIM + ZEBRAK, LLP
5225 Wisconsin Avenue NW, Suite 503
Washington, DC 20015
Tel: (202) 480-2999
Fax: (866) 766-1678
scott@oandzlaw.com
corey@oandzlaw.com

*Attorneys for Plaintiffs*