**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| AMERICAN CHEMICAL SOCIETY ET AL., | |
| | Case No. 8:18-cv-03019-GJH |
| Plaintiffs, | |
| v. | |
| RESEARCHGATE GMBH | |
| Defendant. | |

**DEFENDANT RESEARCHGATE GMBH'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR NOTICE UNDER 17 U.S.C. § 501(B)**

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................................1

II.   FACTUAL BACKGROUND ................................................................................................2

      A.    ResearchGate is a professional network for scientists and researchers. ............................2

      B.    ResearchGate respects copyright. ...................................................................................3

      C.    Plaintiffs do not sign agreements with all of the authors of the articles they
            publish. ..............................................................................................................................4

      D.    Procedural history .............................................................................................................6

            1.    The German litigation .............................................................................................6

            2.    This U.S. litigation .................................................................................................6

III.  ARGUMENT .......................................................................................................................7

      A.    The Copyright Act requires that Plaintiffs notify co-authors who have not entered
            into agreements with Plaintiffs. ......................................................................................7

            1.    Co-authors who have not signed agreements with Plaintiffs "have an
                  interest" in the copyrights that Plaintiffs assert. ...............................................8

            2.    The interests of co-authors who have not signed agreements with Plaintiffs
                  are "likely to be affected" by the outcome of this case........................................10

      B.    In the alternative, the Court may direct notice to co-authors because they "have . .
            . an interest in the copyright." ........................................................................................13

IV.   CONCLUSION....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A & M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ........................................................................11

*Batiste v. Island Records, Inc.*,
  179 F.3d 217 (5th Cir. 1999) ..........................................................................10

*Corbello v. DeVito*,
  777 F.3d 1058 (9th Cir. 2015) ...........................................................................9

*Davis v. Blige*,
  505 F.3d 90 (2d Cir. 2007) .................................................................................8

*Dynamic Sols., Inc. v. Planning & Control, Inc.*,
  No. 86 Civ. 1886-CSH, 1987 WL 6419 (S.D.N.Y. Feb. 2, 1987) .................13

*Kamakazi Music Corp. v. Robbins Music Corp.*,
  534 F. Supp. 69 (S.D.N.Y. 1982) .......................................................................7

*McKay v. Columbia Broad. Sys., Inc.*,
  324 F. 2d 762 (2d Cir. 1963) ...........................................................................10

*Recht v. Metro Goldwyn Mayer Studio, Inc.*,
  580 F. Supp. 2d 775 (W.D. Wis. 2008) .........................................................9, 12

*Stafford Trading, Inc. v. Lovely*,
  No. 05 C 4868, 2007 WL 1512417 (N.D. Ill. May 21, 2007) .......................12

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) ...........................................................................9

*Taylor v. Universal Music Corp., Inc.*,
  No. CV 13-06412 RGK, 2014 WL 12607685 (C.D. Cal. Mar. 10, 2014) .......12

*United States ex rel. Berge v. Bd. of Trs. of the Univ. of Ala.*,
  104 F.3d 1453 (4th Cir. 1997) ...........................................................................8

**Statutes**

17 U.S.C. § 101 ...........................................................................................8, 9

17 U.S.C. § 201 .........................................................................................8, 13

17 U.S.C. § 204 .............................................................................................9

17 U.S.C. § 501 ....................................................................................................... *passim*

17 U.S.C. § 512 ...........................................................................................................3, 4, 13

**Other Authorities**

Fed. R. Civ. P. 19 .......................................................................................................12, 13

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 ........................................7

2 William F. Patry, *Patry on Copyright* § 5:131 (2010) .................................................11

34107406.1 02/13/2019

## I.      INTRODUCTION

This is an unusual case.  A typical copyright infringement lawsuit about copyrighted material appearing online involves a content creator suing a website owner when an unauthorized third party has posted the creator's work to the website without the creator's permission.  But here, Plaintiffs American Chemical Society ("ACS"), Elsevier Inc., Elsevier Ltd., and Elsevier B.V. (collectively, "Elsevier") are suing Defendant ResearchGate GmbH ("ResearchGate") for allowing scientists to share *their own* work.  The articles that Plaintiffs claim appeared on ResearchGate unlawfully were uploaded by those articles' authors—not by unauthorized third parties.  Under Plaintiffs' infringement theories, if ResearchGate is infringing Plaintiffs' copyrights in the articles at issue here, so are those articles' authors.  Accordingly, a finding that the appearance of those articles on the ResearchGate site was infringing would necessarily mean that the people who conducted the research and wrote the articles did not have the right to share them.

Plaintiffs claim they can block scientists from sharing their own work because the scientists supposedly assigned or licensed their rights to Plaintiffs.  But virtually all of the scientific articles at issue in this case were written by more than one person, and sample agreements posted on Plaintiffs' websites suggest that, in many cases, only one of the several co-authors of an article has signed any assignment of copyright in that article to Plaintiffs.  That means that Plaintiffs are seeking a ruling that authors who *never* signed any agreement with Plaintiffs are nevertheless barred from sharing their own work under the terms of the Plaintiffs' agreements with *somebody else*—and Plaintiffs are seeking that ruling without informing any of those authors of this lawsuit.

Section 501(b) of the Copyright Act provides a mechanism for ensuring that these authors are given the opportunity to protect their rights.  Specifically, it provides that courts (1)

1

*may* order copyright plaintiffs to notify individuals of a pending lawsuit (including providing a copy of the complaint) when those individuals "have or claim an interest in the copyright" at issue in their lawsuit and (2) ***shall*** order copyright plaintiffs to notify those individuals if the individuals' "interest[s] [are] likely to be affected by a decision in the case."  17 U.S.C. § 501(b) (emphasis added).

Here, authors of the articles at issue who have never entered into any agreement with Plaintiffs "have . . . an interest in the copyright."  Indeed, because they have never signed their rights over to Plaintiffs, they are, at a minimum, co-owners of the copyrights at issue.  Further, because Plaintiffs can prevail on their contributory infringement theories only if the Court finds that these authors have no right to share their own work, their interests are "likely to be affected" by a decision in the case.  Notice is therefore mandatory under § 501(b).  In the alternative, if the Court finds that notice is not mandatory, it should nevertheless exercise its discretion to require Plaintiffs to give notice to these authors so that they may protect their ownership interest in their scientific works.

## II.   FACTUAL BACKGROUND

### A.   ResearchGate is a professional network for scientists and researchers.

ResearchGate was founded in 2008 by researchers who were frustrated by the barriers that made collaborating with other researchers and scientists difficult, and sought to create a way to make collaboration easier.  That solution was ResearchGate, an online professional network created by scientists for scientists.  Today, more than 15 million ResearchGate members from around the world use ResearchGate to connect and collaborate with other scientists and researchers, ask each other questions, and share and discuss their research.  Decl. of Jay Monahan in Supp. of Def.'s Mot. for Notice under 17 U.S.C. § 501(b) submitted herewith ("Monahan Decl.") ¶ 2.

2

When a scientist signs up for a free account with ResearchGate, he or she can create a personal profile, ask questions of other scientists, and upload his or her **own** work (and only his or her own work) to ResearchGate publication pages.  Authors who choose to do so may upload all kinds of work to ResearchGate—including not only their published articles, but also their conference papers, pre-publication versions of articles, data sets, and research results.  *Id*. ¶¶ 3-4. Authors may choose to share their work publicly, upload it only for viewing by themselves and their co-authors, or share it privately with a particular individual.  *Id.* ¶ 4.  Indeed, the vast majority of "publication pages" on ResearchGate do **not** contain any full text of any content, because the authors have not chosen to share the full text via ResearchGate.  *Id.* ¶ 3.

### B.     ResearchGate respects copyright.

As ResearchGate explains in the "copyright" section of its website, ResearchGate "respect[s] the intellectual property rights of others and ask[s] that [users] do the same." Monahan Decl. ¶ 5 & Ex. 1.  ResearchGate advises authors that, while ResearchGate allows them to store or share their work (both publicly and privately), "it's important that [they] check **in advance** that [they] have the necessary rights to do so."  Monahan Decl. Ex. 1 (emphasis in original).  ResearchGate further informs authors that the best way to verify their rights is to check their agreements with their publisher (if any), and notes that "rights can vary significantly from publisher to publisher and should always be checked."  *Id.*

ResearchGate does not rely solely on its copyright page to remind authors of the importance of copyright.  Prior to uploading an article to ResearchGate, authors must certify that they have the right to do so.  Specifically, before uploading their work to be shared publicly, they must check a box stating "I have reviewed and verified each file I am uploading.  I have the right to share each file publicly, and agree to the Upload Conditions."  Monahan Decl. ¶ 6.

ResearchGate also has a notice and takedown procedure for responding to notices of

3

claimed copyright infringement submitted by copyright owners, as required under § 512(c) of the Digital Millennium Copyright Act ("DMCA").[1]  Monahan Decl. ¶ 7 & Ex. 2.  When a copyright owner notifies ResearchGate that material appearing on ResearchGate is infringing, ResearchGate acts expeditiously to remove the material or disable access to it.  Monahan Decl. ¶ 7.  ResearchGate also has a policy regarding "repeat infringers," which provides that, in appropriate circumstances, either ResearchGate members' uploading rights are disabled or their memberships are terminated.  *Id.*

Elsevier has requested removal of a large number of articles uploaded by articles' authors.  ResearchGate has removed those articles as requested and, in an abundance of caution, has limited the uploading rights and/or locked the accounts of numerous users who have been the subject of repeated removal requests from Elsevier.  *Id.* ¶ 8.

## C.   Plaintiffs do not sign agreements with all of the authors of the articles they publish.

Plaintiffs ACS and Elsevier publish academic journals.  Compl. ¶ 2.  Their journals feature articles submitted to them by scientists, researchers, and others.  Most articles, however, have more than one co-author.  Before publishing an article, Plaintiffs say that they enter into an agreement with one of the article's authors, who is commonly referred to as the "corresponding author."  But they do not require that the other co-authors sign.

For example, in the sample agreement posted on its website, Elsevier requires the

---

[1]   The DMCA provides a number of "safe harbors" that limit the liability for internet service providers, like ResearchGate, who meet certain criteria for infringing material appearing on their systems.  *See* 17 U.S.C. § 512.  To qualify for certain of the safe harbors, the service provider must "respond[] expeditiously to remove, or disable access to," material that a copyright owner has claimed is infringing in a notice that complies with the statute's requirements.  *See id.* § 512(c)(1)(C).  The DMCA also requires that internet service providers "adopt[] and reasonably implement[] . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers. . . ."  *Id.* § 512(i)(1)(A).

corresponding author to confirm that he or she is "one author signing on behalf of all co-authors of the manuscript."  Monahan Decl. Ex. 3 at 1 ("Sample Elsevier Agreement").  The corresponding author's co-authors are not required to sign.  *Id.*  Nor is the corresponding author required to attest that her co-authors have signed any writing authorizing her to enter into an exclusive license on their behalf.  *Id.* at 2 (corresponding author required to agree only that "I have informed the co-author(s) of the terms of this Journal Publishing Agreement and that I am signing on their behalf as their agent, and I am authorized to do so.").  There is no indication on the face of these agreements that the co-authors even *knew* that their ownership rights were being purportedly transferred, much less agreed to that transfer in a signed writing.

ACS has a similar copyright policy.  Monahan Decl. Ex. 4.  For example, in guidance posted on its website with respect to the Journal of the American Chemical Society (one of ACS's several journals), ACS tells corresponding authors that "[a]uthors are required to obtain the consent of all their co-authors prior to submitting a manuscript."  *Id.* at 20.  It also tells corresponding authors that "*[t]he submitting author* accepts the responsibility of notifying all coauthors that the manuscript is being submitted."  *Id.* (emphasis added).  ACS does not enter into an agreement with the co-authors, and the corresponding author is not required to certify that her co-authors authorized her in writing to license or assign the article to ACS.

ACS's template form is consistent with its guidance:  The sample form covering all but two of its journals does not require co-authors to sign.  Rather, it states that "[t]he Corresponding Author or designee below, with the consent of all co-authors, hereby transfers to the ACS the copyright ownership in the referenced Submitted Work . . . ."  Monahan Decl. Ex. 5 at 1 ("Sample ACS Agreement" and together with the Sample Elsevier Agreement, the "Sample

Publisher Agreements").[2]   There is room for only one signature.  *Id.*   Again, nothing in this guidance or on the face of the Sample ACS Agreement shows that the co-authors were aware that their ownership rights were purportedly being transferred or that they had ever provided a signed writing authorizing such a transfer.

### D.     Procedural history

#### 1.     The German litigation

This is not the only pending lawsuit filed by Plaintiffs against ResearchGate.  In October 2017, Plaintiffs sued ResearchGate in Germany for copyright infringement.   ResearchGate argues in that case (among other things) that Plaintiffs do not have valid exclusive licenses or assignments with respect to articles covered by U.S. copyright law because they have not shown that all co-authors have agreed to the license or assignment in writing.  The German court held on October 17, 2018, that it will appoint independent experts to evaluate under U.S. law whether the corresponding author's declaration that he or she is acting on behalf of (and with the consent of) all co-authors is enough to give Plaintiffs exclusive licenses or assignments from all co-authors.   The German court invited both Plaintiffs and ResearchGate to nominate suitable experts, which both parties did on November 16, 2018.  The German court has not yet chosen an independent expert, and the parties await its decision.

#### 2.     This U.S. litigation

Plaintiffs filed this case on October 2, 2018, making many of the same claims that they advance in Germany.  ResearchGate answered on February 13, 2019.

---

[2]   ResearchGate does not know the terms of any particular agreement between ACS or Elsevier and a particular author.   That the Sample Publisher Agreements contain room for only one signature, however, suggests that a significant percentage of Plaintiffs' agreements are signed with only one author.

III.     **ARGUMENT**

Section 501(b) of the Copyright Act provides for both notice and joinder of persons who have an interest in the copyright at issue.  The purpose of § 501(b) is "to avoid a multiplicity of suits by 'insuring to the extent possible that the other owners whose rights may be affected are notified and given a chance to join the action.'"  *Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F. Supp. 69, 74 (S.D.N.Y. 1982) (quoting H.R. Rep. No. 94-1476, at 159 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5775).  That section therefore provides that courts "***may*** require [the plaintiff] to serve written notice of the action with a copy of the complaint upon any person shown, by records of the Copyright Office or otherwise, ***to have or claim an interest in the copyright***."   17 U.S.C. § 501(b) (emphases added).   Further, courts "***shall*** require that such notice be served upon any person ***whose interest is likely to be affected*** by a decision in the case."  *Id.* (emphases added).  Lastly, courts "***may*** require the joinder, and ***shall*** permit the intervention, of ***any person having or claiming an interest in the copyright***."  *Id.* (emphases added).

Here, at a minimum, the co-authors who are not "corresponding authors" and therefore have not signed any agreement with Plaintiffs have an interest in the copyrights that Plaintiffs assert, and that interest is likely to be affected by the Court's ruling in this case.  Notice is therefore mandatory under § 501(b).  Even if the Court determines that the co-authors' interests may not be affected, however, the Court should still exercise its discretion to require Plaintiffs to notify them.

> **A.     The Copyright Act requires that Plaintiffs notify co-authors who have not entered into agreements with Plaintiffs.**

Section 501(b) requires that the Court "shall" direct Plaintiffs to notify co-authors who have not signed any agreement with them because (1) the co-authors have an interest in the

copyrights that Plaintiffs are asserting and (2) that interest is likely to be affected by a ruling in this case.

> **1.      Co-authors who have not signed agreements with Plaintiffs "have an interest" in the copyrights that Plaintiffs assert.**

It is black letter law that "authors of a joint work are co-owners of copyright in the work."  17 U.S.C. § 201(a).  At the time of a work's creation, then, there is no question that all of the work's co-authors have an "interest" in the copyright covering that work for the purposes of § 501(b).

While a co-author may be able to assign (or "exclusively license"[3]) her interest in the copyright in her work to another, the Sample Publisher Agreements suggest that for many co-authors no valid assignments or exclusive licenses to Plaintiffs occurred.  The Sample Publisher Agreements suggest that, with respect to many of the articles at issue, Plaintiffs have likely entered into written agreements with *only* the corresponding author—and not any of the corresponding author's co-authors.  *See* Monahan Decl. Exs. 3 & 5.  But each joint author may at most be able to transfer her *own* rights without her co-authors consent; she may not transfer the rights of her co-authors without their express written consent.  *See, e.g.*, *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) ("An owner may not, however, convey the interests of his fellow co-owners without their express written consent, even if the transferee has no notice of the non-consenting owners' interest."); *see also United States ex rel. Berge v. Bd. of Trs. of the Univ. of*

---

[3]  In copyright, an exclusive license is one type of "transfer of copyright ownership" because the transferee becomes the owner of one or more exclusive rights that make up the copyright.  A nonexclusive license is not a type of transfer of ownership because a nonexclusive licensee (unlike an exclusive licensee) holds no portion of the copyright bundle that could be asserted against third parties.  *See* 17 U.S.C. § 101 ("A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.")

*Ala.*, 104 F.3d 1453, 1461 (4th Cir. 1997) ("Co-owners are treated as tenants in common with each co-owner having an undivided, independent right to use the work, subject only to a duty of accounting for profits to other co-owners.").[4]

Accordingly, that the corresponding author has signed an agreement with one of the Plaintiffs does not mean that her co-authors have relinquished their interests in the copyrights to the articles at issue—including the right to share those articles via ResearchGate.

Nor is it sufficient that the Sample Publisher Agreements require that the corresponding author certify that he or she has his or her co-authors' permission to enter into the agreement: The Copyright Act requires that any "transfer of copyright ownership," including an assignment or an exclusive license, be made through a "writing . . . signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a); *see also* 17 U.S.C. § 101 (defining "transfer of copyright ownership").  Here, the corresponding author must certify that she has her co-author's permission to enter into an agreement, but Plaintiffs' Complaint does not allege any facts suggesting that the non-corresponding authors have transferred their interests to anyone via a signed writing, as the Copyright Act requires in order for any transfer to be valid.

In the absence of any allegation—let alone evidence—that the co-authors ***in fact*** gave the corresponding author permission to license their rights to Plaintiffs, the co-authors should be

---

[4]  Indeed, some courts have held that a purported transfer by just one co-owner does not result in the transfer of copyright rights that can be asserted against third parties.  *See, e.g.*, *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1146 (9th Cir. 2008) ("[U]nless all the other co-owners of the copyright joined in granting an exclusive license . . . , [a party,] acting solely as a co-owner of the copyright, could grant only a nonexclusive license . . . because [that party] may not limit the other co-owners' independent rights to exploit the copyright."); *see also Corbello v. DeVito*, 777 F.3d 1058, 1065 (9th Cir. 2015) (noting that the Ninth Circuit in *Sybersound* "held that when one co-owner independently attempts to grant an exclusive license of a particular copyright interest, that licensee . . . does not have standing to sue alleged third-party infringers.").

presumed to have retained their interest in the copyrights in the articles at issue for the purposes of § 501(b).  *See, e.g.*, *Recht v. Metro Goldwyn Mayer Studio, Inc.*, 580 F. Supp. 2d 775, 784-85 (W.D. Wis. 2008) (requiring the plaintiff to notify the coauthor of a screenplay under § 501(b) because the coauthor was the "presumptive 'co-owner' of the screenplay").

2.      **The interests of co-authors who have not signed agreements with Plaintiffs are "likely to be affected" by the outcome of this case.**

Because Plaintiffs allege that they own exclusive rights in the articles at issue, co-authors' rights are likely to be affected by the outcome of this case.  Compl. ¶ 21 ("ACS and Elsevier are the copyright owners or owners of exclusive rights (by way of signed written agreement) in, *inter alia*, those PJAs listed on Exhibit A . . . .").  Plaintiffs bring four types of copyright infringement claims: (1) direct copyright infringement, *see id.* ¶¶ 54-60; (2) inducement of copyright infringement, *id.* ¶¶ 61-69; (3) contributory copyright infringement, *id.* ¶¶ 70-77; and (4) vicarious copyright infringement, *id.* ¶¶ 78-85.  Because the articles at issue were uploaded to ResearchGate *by their authors*, a finding in Plaintiffs' favor on any of their claims would necessarily depend on a finding that the authors who uploaded the relevant articles to ResearchGate had no right to share their own work.

First, with respect to direct infringement, "a license from a co-holder of a copyright immunizes the licensee from liability to the other co-holder for copyright infringement."  *McKay v. Columbia Broad. Sys., Inc.*, 324 F. 2d 762, 763 (2d Cir. 1963); *see also Batiste v. Island Records, Inc.*, 179 F.3d 217, 224 (5th Cir. 1999) ("[A]n authorization to the defendant from one joint owner will be an effective defense to an infringement action brought by another joint owner.") (alteration in original) (citation omitted).  ResearchGate therefore cannot be liable to Plaintiffs for copyright infringement for the appearance of a given article on its website if one of the article's authors (a) retained her copyright interest in the article and (b) chose to publicly

10

display the article on ResearchGate, or granted ResearchGate an express or implied license to publicly display the article.

By uploading a copy of her article to ResearchGate to be shared publicly, the author herself publicly displayed the article, or at least granted ResearchGate an implied license to display it. *See* 2 William F. Patry, *Patry on Copyright* § 5:131 (2010) ("[C]ourts have noted the potential availability of an implied nonexclusive licens[e] when the circumstances . . . demonstrate that the parties intended that the work would be used for a specific purpose."). ResearchGate can therefore be liable to Plaintiffs for direct infringement only if the author had no right to display it or authorize its display. In other words, a finding that ResearchGate is liable for direct infringement depends on a finding that the author who uploaded the article to ResearchGate had no right to distribute her own work.

Second, Plaintiffs' secondary liability theories (i.e., its claims for inducement, contributory copyright infringement and vicarious copyright infringement) depend on a finding that the author who uploaded her article to ResearchGate is herself infringing Plaintiffs' copyrights. "Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001). Accordingly, all three secondary liability theories that Plaintiffs advance depend on a finding that ResearchGate should be held liable for the actions of ***someone else*** who is directly infringing Plaintiffs' copyrights.

Here, the only third parties who could possibly be the direct infringers of Plaintiffs' copyrights are the authors who uploaded the articles at issue to ResearchGate. That is, for ResearchGate to be liable under a theory of ***secondary liability***, the authors who uploaded the works must be liable under a theory of ***direct liability***—even if those authors never themselves

11

signed any agreement with Plaintiffs.  If the co-authors never signed away their exclusive rights to Plaintiffs, then they do not infringe Plaintiffs' copyrights when they exercise their right as copyright owners to share their own work, and ResearchGate cannot be held secondarily liable for copyright infringement based on the co-authors' actions.

The question of whether co-authors actually agreed to convey the rights in their articles to Plaintiffs exclusively is not merely academic:  While ResearchGate does not have perfect visibility into who the corresponding author is with respect to any particular article, its preliminary analysis suggests that nearly ***60 percent*** of the works in suit here may have been uploaded to ResearchGate by an author who was not the corresponding author.[5]  A ruling in this case in Plaintiffs' favor would necessarily mean that those authors do not have the right to publish their own work, even though they did not sign any agreement with the Plaintiffs.

Courts have recognized that cases, like this one, requiring a declaration of ownership rights and exclusivity are likely to affect co-authors' interests. *See, e.g.*, *Recht*, 580 F. Supp. 2d at 784-85 (ordering the plaintiff to give notice of the lawsuit under § 501(b) to the co-author of a screenplay because a ruling that the plaintiff owned the copyright in the screenplay could affect the co-author's interests); *see also Taylor v. Universal Music Corp., Inc.*, No. CV 13-06412 RGK (AJWx), 2014 WL 12607685, at **4-5 (C.D. Cal. Mar. 10, 2014) (holding under Federal Rule of Civil Procedure 19 that the alleged co-author of a song was a "necessary" party to the action because resolution of the lawsuit could adversely affect the co-author's ownership rights or expose the defendant to multiple liability); *Stafford Trading, Inc. v. Lovely*, No. 05 C 4868,

---

[5]  ResearchGate obtained this number by comparing the author who uploaded the articles listed in Plaintiffs' Complaint to ResearchGate with the author whose contact information was listed on Plaintiffs' website and noting when there was no overlap.  Monahan Decl. ¶ 13.  While ResearchGate recognizes that this is only a preliminary analysis, it is sufficient to show that this is not an abstract exercise but a flaw in Plaintiffs' legal theories that is likely to affect a significant portion (and perhaps a majority) of the works alleged in this lawsuit.

12

2007 WL 1512417, at **12-13 (N.D. Ill. May 21, 2007) (holding under Rule 19 that the interests of third parties who "bought, own and are currently using" the technology at issue would likely be affected in a case where the defendants sought a declaration that the defendants owed the copyrights in the technology); *Dynamic Sols., Inc. v. Planning & Control, Inc.*, No. 86 Civ. 1886-CSH, 1987 WL 6419, at **4-5 (S.D.N.Y. Feb. 2, 1987) (individual who licensed to the defendants the programs alleged to be infringing was a necessary party under Rule 19 because a ruling could, as a practical matter, impede the licensor's interests in the copyright at issue).

So it is here.  A ruling for Plaintiffs requires that the ownership rights of these non-signing co-authors will be snuffed out.  And at the very least, it requires that ResearchGate continue to take down copies of the disputed articles in response to DMCA notices from Plaintiffs, which would directly affect these coauthors' right to control and share their own work in the way they see fit.

Therefore, the rights of authors who never signed any agreement with Plaintiffs are "likely to be affected" by this case for the purposes of § 501(b), and Plaintiffs should be required to notify those authors.

> **B.  In the alternative, the Court may direct notice to co-authors because they "have . . . an interest in the copyright."**

Even if the Court finds that it cannot determine on the record presently before it whether co-authors' interests are likely to be affected by this case (or finds it prudent to defer decision on the underlying legal issues), it still has discretion to order Plaintiffs to notify co-authors of this lawsuit.  As noted above, the Court may, in its discretion, order that Plaintiffs give notice to individuals who "have or claim an interest in the copyright."  17 U.S.C. § 501(b).

As noted above, "authors of a joint work are co-owners of copyright in the work," 17 U.S.C. § 201(a), and the Sample Publisher Agreements that purport to transfer all authors'

copyrights to Plaintiffs require only one author's signature.  *See* Section III.A.1, *supra.*  That is enough for the Court to find that the co-authors "have or claim" an interest in the copyright sufficient that Plaintiffs should be required to notify them of this lawsuit.[6]

First, Plaintiffs' lawsuit asks this Court to bar authors from distributing their own work. These authors should receive notice of Plaintiffs' efforts so that they can participate in the lawsuit if they so choose.  There is good reason to believe that some may choose to do so (or may seek the assistance of their respective academic institutions in doing so), as an intervenor, as a declarant, or even as an *amicus curiae*.  ResearchGate has received a number of messages from users objecting to the removal of articles they have uploaded to ResearchGate publication pages. Monahan Decl. Ex. 9.  This should come as no surprise; the works here are research and academic papers that represent the culmination of years of professional labor which Plaintiffs exploit commercially without sharing any of the revenues with the creators.

Second, it is not unduly burdensome to require Plaintiffs to notify non-signing co-authors of the works in suit.  Plaintiffs can easily identify the co-authors:  they are listed in the article that Plaintiffs themselves publish.  Plaintiffs may well already have contact information for these authors.  If they do not, many authors can easily be located based on the university with which they are currently affiliated.  As a last resort, their information can be obtained from the corresponding author.

Further, to the extent there is any burden at all, that is a problem of Plaintiffs' own making.  Plaintiffs could have entered into written agreements signed by *all* co-authors of the works in suit.  They decided not to do so—possibly for administrative convenience, and possibly

---

[6]  If, for example, the Court finds that the current factual record is insufficient to determine whether co-authors' who never signed an agreement with Plaintiffs nevertheless transferred their copyright interests to Plaintiffs' through the corresponding author, the co-authors' themselves are likely to be the one of the best sources of information on that question.

for other reasons known only to them.  But just like the corresponding author, an article's co-authors are co-owners of the copyright.  That Plaintiffs initially decided to take a short cut and not obtain co-authors' signoff does not excuse them from their obligation now to notify those co-authors of a lawsuit that turns on whether the co-authors have the right to publish their own work.

Given that Plaintiffs seek up to $150,000 in damages ***per article***, Compl. ¶ 59, as well as an injunction that would materially impair these authors' ability to control their own works, *id*. ¶ 58, it is not unduly burdensome for Plaintiffs to notify the authors that Plaintiffs have filed a lawsuit that could result in a finding that the authors have no ownership of their own research.

## IV.    CONCLUSION

For the foregoing reasons, ResearchGate respectfully requests that the Court order Plaintiffs "to serve written notice of the action with a copy of the Complaint upon" each co-author of each journal article at issue in this lawsuit who is not a corresponding author, in a form to be approved by the Court.

34107406.1 02/13/2019

Respectfully submitted,

Dated:  February 13, 2019

By:      _____/s/ Toyja E. Kelley_____

Toyja E. Kelley (Bar No. 26949)
SAUL EWING ARNSTEIN & LEHR LLP
500 E. Pratt Street, Suite 900
Baltimore, MD 21202-3133
410-332-8600
410-332-8862 (facsimile)
Toyja.kelley@saul.com

Mark A. Lemley (*Pro Hac Vice* pending)
Joseph C. Gratz (*Pro Hac Vice* pending)
Allyson R. Bennett (*Pro Hac Vice* pending*)
Aaron J. Benmark (*Pro Hac Vice* pending)
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
415-362-6666
415-236-6300 (facsimile)
mlemley@durietangri.com
jgratz@durietangri.com
abennett@durietangri.com
abenmark@durietangri.com

*Attorneys for Defendant*
*RESEARCHGATE GMBH*

16

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 13th day of February, 2019, a copy of the foregoing

Defendant ResearchGate GmbH's Opening Brief in Support of Its Motion for Notice Under 17

U.S.C. § 501(B) was electronically filed and served on all counsel and parties of record via the

Court's CM/ECF system.


_____/s/ Toyja E. Kelley_____
Toyja E. Kelley