# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| AMERICAN CHEMICAL SOCIETY, et al.<br><br>Plaintiffs,<br><br>v.<br><br>RESEARCHGATE GMBH<br><br>Defendant. | Case No. 8:18-cv-03019-GJH<br><br>Judge George Jarrod Hazel |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR NOTICE UNDER 17 U.S.C. § 501(b)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

  I.    INTRODUCTION ..................................................................................................... 1

 II.    ARGUMENT .............................................................................................................. 4

     A.   ResearchGate has not met its burden of providing evidence to show that any authors have an interest in copyrights at issue in this case ........................................... 4

     B.   Authors have already had an opportunity to assert their rights but declined to do so ........ 8

     C.   Case law demands denying ResearchGate's motion ....................................................... 9

     D.   The purpose and history of § 501(b) make clear that § 501(b) does not apply to this case ................................................................................................................................ 12

     E.   The relief ResearchGate seeks would have severe practical consequences while improperly converting §501(b) into a tool for ResearchGate's own discovery ................ 14

III.   CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

Cases
*Bartges v. Univ. of N. Carolina at Charolotte*, 908 F. Supp. 13, 1324 (W.D.N.C.), aff'd, 94 F.3d 641 (4th Cir. 1996) ...................................................................................................................9

*Davis v. Blige,* 505 F.3d90, 104 (2d Cir. 2007) ....................................................................... 5-6

*Dynamic Solutions, Inc. v. Planning & Control, Inc.,* No. 86 Civ. 1886 (CSH), 1987 (S.D.N.Y.) Feb. 2, 1987................................................................................................................ 10-11

*Followay Prods., Inc. v. Mauer,* 603 F.2d 72, 74 (9th Cir. 1979) .................................................12

*Kamakazi Music Corp. v. Robbins Music Corp.,* 534 F. Supp. 69, 74 (S.D.N.Y.) 1982) ............13

*M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 434 (4th Cir. 1986) ...............................................7

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.,* 722 F.3d 591, 600 (4th Cir. 2013) ......................................................................................................... 3-4, 8

*Recht v. Metro Goldwyn Mayer Studio, Inc.,* 580 F. 2d 775, 784-85 (W.D. Wis. 2008) ......... 9-11

*Stafford Trading Inc. v. Lovely,* No. 05 C 4868, 2007 WL 1512417 (N.D. III. May 21, 2007) . 10-11

*Taylor v. Universal Music Group Corp., Inc.,* No. CV 13-06412 (RGK) (AJWX), 2014 WL 12607685 (C.D. Cal. Mar. 10, 2014) .....................................................................................11

Statutes
17 U.S.C. § 204 ........................................................................................................2, 3, 5, 6, 8

17 U.S.C. § 410 ..........................................................................................................................7

17 U.S.C. § 501 ................................................................................................................ *passim*

Rules
Fed. R. Civ. P. 19 ......................................................................................................................10

I.      **INTRODUCTION**

Defendant ResearchGate GmbH ("Defendant") distorts the core issues in suit.  This case is not about an author independently deciding to upload from his or her computer a copy of something he or she wrote.  Nor does ResearchGate passively host a forum where infringement just happens to occur.  This case is about ResearchGate intentionally infringing, including by actively copying, peer-reviewed scientific articles protected by copyright.

While seeking an order requiring Plaintiffs to serve notice under 17 U.S.C. § 501(b), ResearchGate presents a sanitized version of itself.  ResearchGate conveniently omits that it has engaged in massive unauthorized copying by searching for copyrighted publications on the Internet and copying them onto its computers for its commercial use for its website.  Answer ¶¶ 4, 26, 28, 29, 37.  ResearchGate further omits that it specifically asks authors to "upload" or "import" the full-text of particular published journal articles that it knows are protected by copyright, Answer ¶¶ 37-41, and consistently deceives users about the impropriety of those "uploads."  ResearchGate tells the Court that authors uploaded the articles, but misleadingly refers to "uploading" or "importing" as including the publications that ResearchGate proactively sourced on the Internet and copied to its computer servers, as opposed just to what a user provides from their own computer.  *See* Answer ¶¶ 29, 37.  In reality, ResearchGate has willfully designed and actively operated its website as a hub for illegal infringement.  Compl. ¶ 22.

ResearchGate's motion fails on both the facts and the law.  Notice pursuant to 17 U.S.C. § 501(b) is exceedingly rare and no court has ever ordered it in circumstances remotely akin to those in this case.  ResearchGate cannot point to a single case ordering notice under § 501(b) based on the bare, disputed, unsupported allegations of one party.  The handful of cases where notice has been ordered are nothing like the instant dispute and involved situations where the third party's interest in the case was obvious.  Here, ResearchGate's argument is premature: the

time to argue any putative defense of license, or contest the scope of Plaintiffs' ownership rights, is at summary judgment or trial. The history and structure of 17 U.S.C. § 501(b) further make clear that the statute does not countenance the relief ResearchGate seeks. Section 501(b) is designed to give all potential plaintiffs an opportunity to participate in a single action in order to avoid a multiplicity of lawsuits, but that is not the purpose for which ResearchGate brings this motion.

In an attempt to prop up its motion and distract from its own conduct, ResearchGate manufactures a dispute between publishers and authors where none exists. Plaintiffs have a long history of working productively and fruitfully with researchers and scientists. Contrary to ResearchGate's hyperbolic accusations, Plaintiffs are not looking to "snuff out" authors' rights or "block" authors from sharing their work. The authors of the works in suit listed in Exhibit A to the Complaint (the "Works") freely sought the benefits of publishing with Plaintiffs, including the peer-review process and prestige and exposure that come with such publication, without controversy or incident thereafter.

ResearchGate relies on the 17 U.S.C. § 204(a) requirement of a signed writing for assignments but fails to make a credible showing that § 204(a) is not satisfied here. ResearchGate's motion presumes a favorable factual record without actually providing one: ResearchGate offers nothing beyond two sample publishing agreement templates and a boatload of conjecture and argument. The plain language of the statute makes clear that the speculation, conjecture, and unfounded assertions ResearchGate offers do not trigger § 501(b)'s notice provisions. Any affirmative defenses ResearchGate may try to raise at summary judgment or trial do not justify the massive notifications ResearchGate seeks now for its own benefit.

The wafer-thin record presently before the Court easily dispels ResearchGate's request. By ResearchGate's calculations, nearly half the Works were uploaded by authors who had

already transferred their copyrights to Plaintiffs.  Def.'s Mem. 12.  There is no possible reason to bother those authors.  As to the rest of the Works, which ResearchGate contends are properly licensed to it from co-authors and thus non-infringing, ResearchGate puts the cart before the horse.  First, ResearchGate fails to demonstrate whether it copied these Works to its servers on its own initiative, *see* Answer ¶¶ 4, 29, 37, or received the Works as a result of a user uploading it from his or her computer; in the former scenario, there is no possibility of a valid license.  Second, the corresponding authors represented they had the necessary authority to transfer their copyright and any co-authors' copyright and ResearchGate offers no evidence to show otherwise.  Third, the Works have been the subject of takedown notices.  Tellingly, ResearchGate has not cited a single example of any author filing a counter-notice disputing the takedown—a fact consistent with all authors knowing that they already transferred their copyrights.

Recognizing that it lacks sufficient evidence to support its motion, ResearchGate tries to evade its burden by arguing that "the co-authors should be presumed to have retained their interest in the copyrights in the articles at issue for the purposes of § 501(b)."  Def.'s Mem. 9-10.  However, ResearchGate offers no support for that wholly unprecedented argument, and § 501(b) does not contain any such presumption.  In fact, ResearchGate gets the presumption entirely backward.  The Works are protected by copyright registrations, which create a presumption of Plaintiffs' ownership.  The Court should not set aside that well-established presumption to allow ResearchGate to use § 501(b) notice as a litigation tactic.  In situations like this one, "where the copyright author appears to have no dispute with its assignee on this matter," the Fourth Circuit has held that "it would be anomalous to permit a third party infringer to invoke § 204(a)'s signed writing requirement against the assignee."  *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty*

3

*Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) (internal citations and quotation marks omitted).

ResearchGate purports to be protecting authors but nothing could be further from the truth.  The relief that ResearchGate seeks is a litigation tactic for its benefit only.  ResearchGate's demanded notice will distract researchers and scientists from their important work and cause confusion.  The scenario ResearchGate envisions, where authors and academic institutions submit unsolicited declarations and *amicus curiae* filings, could slow this case to a crawl and turn it into a circus.  ResearchGate's goal is to inhibit Plaintiffs and other journal publishers from asserting their rights and to unsettle publishers' relationships with authors.  By asking that the Court order corresponding authors to produce information, as well as hoping that third parties submit declarations, ResearchGate further reveals its true purpose is not to protect authors but to use § 501(b) to circumvent discovery processes.

## II.     ARGUMENT

ResearchGate's motion for an order requiring Plaintiffs to serve notice under 17 U.S.C. § 501(b) motion is not supported by the statute, case law, or the record before the Court.  It should be denied in its entirety.

### A. ResearchGate has not met its burden of providing evidence to show that any authors have an interest in copyrights at issue in this case.

There is no basis for ordering notice in this case.  17 U.S.C. § 501(b) only requires that "notice be served upon any person whose interest is ***likely to be affected*** by a decision in the case." (emphasis added).  Similarly, a Court only has discretion to order notice "upon any person ***shown***, by the records of the Copyright Office or otherwise, ***to have or claim an interest*** in the copyright . . . ." *Id.* (emphasis added).  The statute's plain language makes clear that mere speculation and unfounded assertions do not trigger § 501(b)'s notice provisions; rather,

4

ResearchGate must show that the persons to be noticed are "likely to be affected" or have been "shown . . . to have or claim an interest in the copyright . . . ." ResearchGate has not done so.

ResearchGate argues that some authors who uploaded articles could legally do so because they retained an ownership interest. This argument fails.

First, ResearchGate assumes, without providing any basis, that the co-author actually uploaded the works. In fact, ResearchGate's Answer reveals that ResearchGate may have copied without authorization many works to its servers *before* any author took any action.[1] But any subsequent action by an author cannot retroactively immunize ResearchGate's infringement. *Davis v. Blige*, 505 F.3d 90, 104 (2d Cir. 2007).

Second, ResearchGate contends that some authors retained an ownership interest because, in some cases, not every author of a joint work signed the publication agreement. But ResearchGate overlooks that the Copyright Act does not require that all owners of a copyright must sign the instrument of assignment to transfer all owners' rights. Section 204(a) of the Copyright Act provides that a transfer of copyright ownership must be "in writing and signed by the owner of the rights conveyed or ***such owner's duly authorized agent***." 17 U.S.C. § 204(a) (emphasis added).

ResearchGate points to no facts showing that corresponding authors who signed the publication agreements were not acting as the duly authorized agents of their co-authors.[2] The

---

[1] "ResearchGate admits that, through an automated process, it accesses copies, which are never publicly displayed, of certain publicly available publications (as well as certain textual content) that are then uploaded to servers it owns or controls for the purposes of indexing that content. . . . ResearchGate admits that when an author chooses to make a publication publicly available on ResearchGate via the import feature, ResearchGate, through an automated process and at the author's direction, accesses a pdf likely to be a publicly available version of the article, which is then uploaded to ResearchGate." Answer ¶¶ 28-29.

[2] ResearchGate cites *Davis. v. Blige* for the proposition that a joint author "may not transfer the rights of her co-authors without their express written consent." Def.'s Mem. 8 (citing *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007)). That statement from *Davis* is inapposite. Nothing in §

5

only evidence ResearchGate has submitted are two sample publication agreement templates. But both sample publication agreement templates make clear that, by signing the publication agreement, the corresponding author represents that he or she has precisely the authority § 204(a) requires. In the sample Elsevier publication agreement ResearchGate submitted, the corresponding author represents that the he or she "ha[s] informed the co-author(s) of the terms of this Journal Publishing Agreement and that I am signing on their behalf as their agent, and I am authorized to do so." Monahan Decl. Ex. 3 at 4. The sample ACS publication agreement provides that "[t]he Corresponding Author or designee below, *with the consent of all co-authors*, hereby transfers to the ACS the copyright ownership in the referenced Submitted Work . . . ." Monahan Decl. Ex. 5 at 2 (emphasis added). In both cases, the corresponding author acts as the duly authorized agent for all co-authors. Nothing in the record disputes this.

All available evidence before the Court corroborates the terms in the publication agreements that the corresponding authors acted as the duly authorized agents of their co-authors. For instance, ResearchGate has not shown these non-corresponding authors engaged in the kinds of actions consistent with copyright ownership, such as: attempting to register the work; disputing a takedown notice concerning the work; bringing an action for infringement against a third party; or even attempting to publish the article in a different journal in contravention of the publication agreement.

---

204(a) requires that the authorization of the agent, as opposed to the transfer instrument itself, be in writing. On this point of agent authorization, the statement from *Davis* upon which ResearchGate relies is *dicta* and should be given no weight. The actual holding in *Davis* had nothing to do with the authorization of an agent, instead holding that one co-owner cannot retroactively license an infringer's conduct in order to extinguish another co-owner's claim for infringement. *Id.* at 104. In fact, the only authority *Davis* cites mentions only that the co-owner must consent or ratify the transfer, without indicating that a writing is required. *Id.* at 99 (citing *Crosney v. Edward Small Productions*, 52 F. Supp. 559, 561 (S.D.N.Y.1942)). Moreover, even if § 204(a) required that an agent's authorization be in writing (and it does not), ResearchGate points to no evidence showing that the corresponding authors lacked their co-authors' express written consent.

6

Implicitly acknowledging that it has no evidence, ResearchGate tries to evade its evidentiary burden by arguing that "the co-authors should be presumed to have retained their interest in the copyrights in the articles at issue for the purposes of § 501(b)." Def.'s Mem. 9-10. However, ResearchGate's ploy to shift the burden of proof on ownership mischaracterizes the Complaint's allegations and is belied by settled law. The Complaint alleges that, "[w]hen ACS and Elsevier accept articles for publication in their peer-reviewed journals, the ***authors*** transfer copyright ownership of the PJA to ACS or Elsevier through a signed written agreement." Compl. ¶ 21 (emphasis added). ResearchGate's argument that "Plaintiffs' Complaint does not allege any facts suggesting that the non-corresponding authors have transferred their interests to anyone via a signed writing," Def.'s Mem. 9, misreads this allegation.

Further, the Complaint alleges that ACS and Elsevier have registered all of the works at issue with the United States Copyright Office. Compl. ¶ 21. ResearchGate does not dispute this fact in its motion. Registration of a copyright constitutes "prima facie evidence" of ownership of that copyright. 17 U.S.C. § 410(c). Once registration is established, the infringer has the burden of rebutting this presumption of ownership. *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986). ResearchGate has not done so. ResearchGate's attempt to ignore settled law by arguing that "the co-authors should be presumed to have retained their interest" gets the relevant presumption exactly backward.

ResearchGate's own website makes clear that it has cooked up this argument purely as a litigation tactic. If ResearchGate truly believed that non-corresponding co-authors were not bound by their publication agreements and retained all rights to share published articles on ResearchGate, one would expect the intellectual property policy on ResearchGate's website to trumpet that claim loud and clear. But it does not. Giving up the game, ResearchGate's Intellectual Property Policy makes no mention of the theory ResearchGate here advances. *See*

7

Monahan Decl. Ex. 2. Instead, ResearchGate tells authors that "[y]our starting point for understanding your rights is the agreement(s) you have with your publisher or other rights owner." *Id.* at 1.

Any dispute over ownership between Plaintiffs and authors is entirely of ResearchGate's invention. ResearchGate has not provided any basis to doubt that that Plaintiffs own the copyrights in question. The Fourth Circuit's admonition that, "in situations where the copyright author appears to have no dispute with its assignee on this matter, it would be anomalous to permit a third party infringer to invoke § 204(a)'s signed writing requirement against the assignee" applies directly here. *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 600 (4th Cir. 2013) (internal citations and quotation marks omitted). ResearchGate cannot excuse its illegal conduct by falsely pitting publishers and authors against each other.

### B. Authors have already had an opportunity to assert their rights but declined to do so.

It is significant that ResearchGate has not identified any counter notices from an author of a Work. The point of ResearchGate's motion is that authors must be notified so they can assert their rights. The authors already had a chance to assert their rights, however, and did not dispute that the Works appeared on ResearchGate's site without authorization.

ResearchGate's Intellectual Property Policy provides a mechanism for an author to dispute a takedown notice for which they are identified as the uploader. Specifically, according to ResearchGate's Intellectual Property Policy, ResearchGate notifies members whose uploads are subject to takedown notices and then provides an opportunity for the member to submit a "counter notice" in which a person can claim that the material is not infringing and should not have been removed. Monahan Decl. Ex. 2 at 1-3. ResearchGate's Intellectual Property Policy includes a link to a form for submitting such a counter notice. *Id.* In other words, ResearchGate

8

gives its users an opportunity to claim that they own the rights to the work they upload and that ResearchGate's use of the work is not infringing—precisely the issue for which ResearchGate wants to send notices now.

Revealingly, while ResearchGate admits that it has received a large volume of takedown notices from Plaintiffs, Monahan Decl. ¶ 8, Answer ¶ 49, ResearchGate does not assert that it has received even one counter notice from any author of a Work. ResearchGate claims only that it has "received a number of messages from users objecting to the removal of articles they have uploaded to ResearchGate publication pages." Def.'s Mem. 14 (citing Monahan Decl. ¶ 9). But this assertion is too general and non-specific to be given any weight. *See, e.g.*, *Bartges v. Univ. of N. Carolina at Charlotte*, 908 F. Supp. 1312, 1324 (W.D.N.C. 1995), *aff'd,* 94 F.3d 641 (4th Cir. 1996) ("conclusory and general assertions are not the specific facts needed" to satisfy a movant's burden). These "messages from users" are not the same as "counter notices" in which a person claims, under penalty of perjury, that ResearchGate's use of the work is not infringing. Further, ResearchGate does not even claim that the messages concern the Works. That some unknown number of unidentified users may have complained about some unspecified takedowns proves nothing at all.

### C. Case law demands denying ResearchGate's motion.

No court has ever ordered notice under § 501(b) in circumstances akin to those in this case, let alone on a non-existent record like this one. ResearchGate cannot point to a single case ordering notice served based on the bare, disputed, unsupported allegations of one party. ResearchGate's citation to "cases[] like this one," Def.'s Mem. 12, misleads the Court about the facts of those cases: those cases are nothing like this one.

ResearchGate cites only one case where a court ordered notice be served under § 501(b), a 2008 case from the Western District of Wisconsin. Def.'s Mem. 12 (citing *Recht v. Metro*

9

*Goldwyn Mayer Studio, Inc.*, 580 F. Supp. 2d 775, 784-85 (W.D. Wis. 2008)). But *Recht* provides no authority for the relief ResearchGate requests. The plaintiff in *Recht* did not dispute that its co-author held ownership rights—rather, the complaint itself revealed the existence of the co-author's ownership interest—and *Recht* involved only one co-author. *Id.* Neither is the case here. The Complaint alleges that ACS and Elsevier own all of the rights at issue, Compl. ¶ 21, ResearchGate has provided no evidence to show otherwise, and this case involves thousands of authors.

ResearchGate also relies on several cases concerning joinder, but joinder under Fed. R. Civ. P. 19 and notice under § 501(b) are not equivalent. As one leading commentator has observed, in copyright cases "[r]eliance solely on Fed. R. Civ. P. 19 may lead to decisions inconsistent with the Copyright Act." 6 William F. Patry, PATRY ON COPYRIGHT § 21:34 (March 2019 Update). For example, contrary to what Rule 19 might suggest, joinder of all co-owners is not required. *Id.* Even if joinder cases had some relevance, the cases ResearchGate cites requiring joinder of third parties are no more persuasive than the § 501(b) case ResearchGate cites. None involve facts where the third party's interest in the litigation was disputed. In *Dynamic Solutions, Inc. v. Planning & Control, Inc.*, it was uncontested that the third party at issue, plaintiff's ex-employee, had licensed the allegedly infringing software to defendants. No. 86 CIV. 1886 (CSH), 1987 WL 6419, at *4 (S.D.N.Y. Feb. 2, 1987). Further, the ex-employee had represented through defendants' counsel that he claimed an interest in the action and was amenable to being joined, the ex-employee had filed a copyright registration application for the software at issue, and the ex-employee's attorney had attended hearings in the case. *Id.* at *4-*5.

In *Stafford Trading Inc. v. Lovely*, a dispute over rights in software applications, the third parties to be joined were a bank and its affiliate that had "bought, own[ed] and [were] currently using" the software applications at issue. No. 05 C 4868, 2007 WL 1512417, at *12 (N.D. Ill.

May 21, 2007). The bank was held to be a necessary party under Rule 19 because the defendants sought a declaration that they were "the rightful owners of copyrights," which would "manifestly prejudice" the bank that had purchased and was using the software. *Id.* at *13; *see also Taylor v. Universal Music Corp., Inc.*, No. CV 13-06412 (RGK) (AJWX), 2014 WL 12607685, at *4 (C.D. Cal. Mar. 10, 2014) (requiring joinder of co-author where complaint disclosed co-author's rights).

There is a world of difference between the facts in *Recht*, *Dynamic Solutions*, and *Stafford* and those here. Those cases involved one or two parties, not several thousand. More fundamentally, in those cases the third party's interest in the case was clear, uncontested, and supported by significant evidence. Unlike here, the plaintiff in *Recht* did not dispute that its co-author held ownership rights—rather, the complaint itself disclosed the co-author's ownership interest. Unlike here, the ex-employee in *Dynamic Solutions* had indicated an interest in being joined, had attempted to register the work at issue, and its counsel was already attending hearings. Unlike here, the bank in *Stafford* had purchased and was using the software at issue, which the relief sought would prevent it from doing. And unlike here, the third parties in those cases had asserted an ownership interest before the litigation began and had not already passed up an opportunity to assert their rights. Finally, the disputes in *Dynamic Solutions* and *Stafford* arose out of long-standing business relationships in which multiple parties to the relationship claimed ownership in the intellectual property that had been an essential element of the business relationship; that dynamic is absent here. Those cases thus do not lend any support for the proposition that bare, disputed, unsupported assertions by one party are a sufficient basis for requiring notice under § 501(b) or joinder under Rule 19.

ResearchGate's motion implies that an infringing defendant in a copyright case can require notice be served under § 501(b) in any situation in which a defendant can invent some

11

argument, no matter how unsupported or contrary to the record before the Court, that someone else somewhere might own the copyrights at issue. But, as shown above, that is not the law.

### D. The purpose and history of § 501(b) make clear that § 501(b) does not apply to this case.

ResearchGate's argument perverts the purpose of § 501(b) of liberalizing copyright joinder rules while avoiding multiple lawsuits. Understanding the purpose of § 501(b) requires a review of its history. The 1909 Copyright Act had required joining as a plaintiff the original owner of all rights in any suit brought by that owner's exclusive licensee. 6 William F. Patry, PATRY ON COPYRIGHT § 21:32 (March 2019 Update). This was because, under the 1909 Act, an exclusive licensee could not sue for infringement in its own name, but only in the owner-licensor's name. *Followay Prods., Inc. v. Maurer*, 603 F.2d 72, 74 (9th Cir. 1979). This joinder requirement created a significant obstacle to enforcement because the original owner often refused to be joined or could not be joined due to lack of personal jurisdiction; under the 1909 Act, this required dismissal for failure to join an indispensable party. *Followay*, 603 F.2d at 72.

The 1976 Copyright Act aimed to address this problem. Accordingly, the first sentence of § 501(b) of the 1976 Copyright Act eliminated the 1909 Act's onerous joinder requirement by permitting the "[t]he legal or beneficial owner of an exclusive right . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b); 6 William F. Patry, PATRY ON COPYRIGHT § 21:32 (March 2019 Update) (describing § 501(b) as "a deliberate departure from the 1909 Act"). Having deprived the owner-licensor of a procedural right in its first sentence, § 501(b) struck a compromise in its second sentence by allowing a court to require notice to "any person shown . . . to have a claim or interest in the copyright." *Id.* Section 501(b)'s notice provision in its second sentence thus must be understood within the context of § 501(b)'s elimination of the joinder requirement in its first sentence.

By expanding standing to sue to a much wider range of licensees and rightsholders, § 501(b) created a risk of multiple lawsuits. Section 501(b)'s notice and joinder provisions thus:

> are intended to eliminate a hazard created by the section's grant of standing to holders of overlapping interests. . . . Congress designed the notice provisions in part to reduce the danger to the owner of an exclusive right "who discovers too late that, as the result of a judgment in an action brought by the owner of another exclusive right in a remote jurisdiction, he can no longer enforce his rights because the defendant is judgment proof, because of the doctrines of *res judicata*, collateral estoppel, etc.

3 Paul Goldstein, GOLDSTEIN ON COPYRIGHT 3d Ed. § 15.5.2 (quoting H. Comm. on the Judiciary, 89th Cong., 1st Sess., Copyright Law Revision: Supplemental Report of Register of Copyrights on General Revision of U.S. Copyright Law: 1965 Revision Bill, Copyright Law Revision Part 6 (Comm. Print 1965)). ResearchGate's citation to the House Report regarding "avoid[ing] a multiplicity of suits . . . ." is consistent with the purpose expressed here. *See* Def.'s Mem. 7 (citing *Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F. Supp. 69, 74 (S.D.N.Y. 1982) (quoting H.R. Rep. No. 94-1476, at 159 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5775)).

Understood in this context, § 501(b) simply has nothing to do with this case. The sample publication agreements ResearchGate submitted show that Plaintiffs are not exclusive licensees of the holder of the copyrights but own the copyrights themselves via assignment. *See* Monahan Decl. Ex. 3 at 3 ("I hereby assign to [the publisher] the copyright in the manuscript identified above . . . ."); Monahan Decl. Ex. 5 at 2 ("The Corresponding Author or designee below, with the consent of all co-authors, hereby transfers to the ACS the copyright ownership in the referenced Submitted Work . . . ."). In such a scenario, there are no remaining owner-licensors whose joinder the 1909 Act would have required and who therefore should receive notice under § 501(b). Nor are there other owners besides Plaintiffs of exclusive rights who should be given an opportunity to join as a plaintiff to avoid a potential multiplicity of suits. Section 501(b) is

13

designed to give all potential plaintiffs an opportunity to participate in a single action, but that is not the purpose for which ResearchGate brings this motion—ResearchGate does not premise its motion on the need to add additional plaintiffs to the case in order to avoid multiple lawsuits.

### E. The relief ResearchGate seeks would have severe practical consequences while improperly converting § 501(b) into a tool for ResearchGate's own discovery.

Requiring notice to all non-corresponding authors will impose immense unnecessary burdens, including on the Court. The purpose of notice under § 501(b) is to allow parties with an interest in the dispute an opportunity to intervene. 6 William F. Patry, PATRY ON COPYRIGHT § 21:32 (March 2019 Update). As made clear above, there is no basis for any co-authors to intervene. Nevertheless, sending notices to several thousand co-authors that they "have or claim an interest in the copyright" will inevitably cause many authors to approach the Court. Recognizing that requiring a basis for intervention sets too high a bar for its purposes, ResearchGate seeks to stretch § 501(b) beyond all bounds by asserting that authors "may choose to [participate] (or may seek the assistance of their respective academic institutions in doing so), as an intervenor, as a declarant, or even as an *amicus curiae*." Def.'s Mem. 14. But § 501(b) is not a tool for soliciting declarations or *amici* and permitting ResearchGate to pervert the statute in this way would turn the proceedings into a circus designed to prevent Plaintiffs from asserting their rights and the Court from adjudicating the case.

Requiring notice will also prejudice the authors themselves. As made clear above, ResearchGate has not shown there is any dispute between Plaintiffs and the authors over ownership. Sending the notice ResearchGate requests will breed confusion in the scholarly community while distracting researchers and scientists from their core mission. Researchers inevitably will waste time and resources raising fruitless questions and concerns with Plaintiffs, ResearchGate, and the Court. Many of the authors are located outside the United States and may be unfamiliar with the United States legal system; being sent legal documents will confuse them,

14

and some may even feel threatened. And it is all unnecessary: there is no dispute between Plaintiffs and the authors. Moreover, the authors that ResearchGate identifies as the uploaders have already declined the opportunity to submit a counter notice through ResearchGate's website to dispute that an upload was infringing.

Finally, requiring notice to all non-corresponding authors is not the trivial task that Defendants posit. There are 3,143 Works in the case, published over the course of several years, with literally thousands of authors. As ResearchGate surmises, Plaintiffs do not necessarily have complete or current contact information for all co-authors, let alone an active email address for each co-author. Thus, the exercise will be costly, logistically complicated, and time-consuming, for no proportional benefit.

Far from protecting authors, ResearchGate reveals its true face when it blithely asserts that co-authors' contact missing contact information "can be obtained from the corresponding author." Def.'s Mem. 14. The corresponding authors have undisputedly transferred their rights and have no interest in this case, yet ResearchGate would happily conscript them. Of course, nothing in § 501(b) authorizes imposing production burdens on third parties, and the Court should not permit ResearchGate to use § 501(b) to circumvent standard discovery procedures. Section 501(b) is not a net for ResearchGate to cast on its fishing expedition to find evidence to excuse its infringement.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court reject Defendant's request for an order requiring Plaintiffs to provide notice pursuant to 17 U.S.C. § 501(b).

DATED: March 11, 2019       /s/ Scott A. Zebrak
                                                  Scott A. Zebrak (Bar Number 17741)
                                                  Corey Miller
                                                  OPPENHEIM + ZEBRAK, LLP
                                                  4530 Wisconsin Avenue NW, 5th Floor

Washington, DC 20016
Tel: (202) 480-2999
Fax: (866) 766-1678
scott@oandzlaw.com
corey@oandzlaw.com

*Attorneys for Plaintiffs*