

Scott A. Zebrak
4530 Wisconsin Avenue NW, 5th Floor
Washington, DC  20016
202.450.3758 | scott@oandzlaw.com

February 25, 2020

<u>Via ECF</u>

Honorable George J. Hazel
United States District Court, District of Maryland
Greenbelt Division
6500 Cherrywood Lane
Suite 445A
Greenbelt, MD 20770

> Re:   ***American Chemical Society et al. v. ResearchGate GmbH***,
> **No. 8:18-cv-03019-GJH**

Dear Judge Hazel:

On behalf of Plaintiffs American Chemical Society, Elsevier Inc., Elsevier Ltd., and Elsevier
B.V. (collectively, "Plaintiffs") in the above-captioned action, we write in opposition to the
letter-motion to compel Defendant ResearchGate GmbH ("ResearchGate") filed on February 11,
2020 (the "Letter").  (ECF No. 43.)

## I.  Background

In this lawsuit, Plaintiffs seek redress for ResearchGate's massive infringement of their
copyrighted works.  Plaintiffs are leading journal publishers with storied histories.  ResearchGate
is a well-funded, for-profit company based in Germany.  ResearchGate has built its business by
intentionally using unauthorized copies of peer-reviewed published journal articles ("PJAs"),
including those from Plaintiffs' journals, to lure researchers, scientists, and others to its
commercial social networking / file-sharing website.  ResearchGate is no passive host of a forum
where infringement just happens to occur; ResearchGate has actively copied Plaintiffs' PJAs and
operated its website as a hub for illegal infringement.  Plaintiffs have asserted claims of direct
infringement, induced infringement, contributory infringement, and vicarious copyright
infringement against ResearchGate.

The parties served interrogatories and document requests in mid-March 2019.  Nearly six months
later, ResearchGate had provided only one document, which was non-responsive and given
solely for the purpose of a meet-and-confer call.  By that time, Plaintiffs had worked diligently to

respond to ResearchGate's discovery requests and already produced approximately 17,000 documents, consisting of over 200,000 pages and over 2,700 native files.  On September 12, 2019, Plaintiffs filed a letter-motion to compel discovery.  (ECF No. 36.)  Only then did ResearchGate begin producing documents.  During a telephonic conference with the Court on October 21, 2019, and immediately thereafter, ResearchGate withdrew a host of objections and agreed to produce the documents at issue in Plaintiffs' motion.  (ECF No. 39.)  In November and December 2019, Plaintiffs requested ResearchGate follow through on its commitment to produce documents, but to no avail.  ResearchGate did not produce any additional documents until January and February 2020.

To date, Plaintiffs have produced 24,810 documents totaling 414,904 pages, as well as another 68,280 native documents.  For its part, ResearchGate has produced only 7,153 documents totaling approximately 44,000 pages, as well as 1,028 native documents, with most of its production taking place in the past two months.  The size of the parties' respective discovery productions is backward.  In an infringement case like this, the bulk of the discovery should focus on the activities, knowledge, intent, and documents of the accused infringer, not Plaintiffs.

The parties recently proposed a revised scheduling order to the Court, which was entered.  (ECF Nos. 40, 44.)  Document discovery should be substantially completed by the end of March, with depositions to follow.  After fact discovery ends in mid-July, there is a several month period for expert reports and expert depositions.

## II.  The discovery ResearchGate seeks is irrelevant, unduly burdensome, and disproportionate to the issues in the case.

ResearchGate proceeds based on vague and conclusory rhetoric, hypothetical facts, and theories that fail on their face.  The discovery it seeks is irrelevant, unduly burdensome, and disproportionate.  While Plaintiffs have already acquiesced to several of ResearchGate's unreasonable discovery demands, they maintain their objections on certain issues, as discussed below.

### A.  No documents showing the value of the PJAs in Suit exist, and the documents ResearchGate seeks cannot be used to determine the PJAs' value.

ResearchGate's RFP Nos. 7, 10, and 11 seek revenue, cost and profit information for the PJAs at issue in this case.  As Plaintiffs have repeatedly explained to ResearchGate, these requests seek documents that simply do not exist.  Recognizing this fact, ResearchGate instead seeks revenue, cost and profit information for the journals in which the PJAs were published.

The highly sensitive documents that ResearchGate seeks as a substitute are far too attenuated to the issues in the case to be relevant.  This lawsuit is about ResearchGate's direct and secondary infringement of PJAs from Plaintiffs' peer-reviewed journals.  The 3,094 PJAs currently in suit span nearly 600 journals.  Each PJA was published within a particular issue of a particular journal.  These journals have multiple issues per year, with many PJAs within each issue.  Plaintiffs have explained that the information ResearchGate seeks is not available at the article

level nor even at the level of a particular journal issue, as Plaintiffs do not maintain their records at that level of detail.

Nonetheless, ResearchGate seeks an order compelling Plaintiffs to produce journal-level profit-and-loss statements ("P&Ls"). The journal-level P&Ls contain sensitive commercial information that is not made public. Further, the journal-level information is far too attenuated from the article-level inquiry that is the basis of ResearchGate's discovery requests. First, the journal-level P&Ls are two significant steps away from the PJA, reflecting the collective financial performance of many journal issues, each of which contains many PJAs. Second, the journal-level financials that ResearchGate seeks typically reflect revenue from subscription packages for access to many, in some cases thousands, of different journals. Thus, journal P&Ls do not enable an analysis of the financial impact of infringement of any individual PJA.

ResearchGate's only response is a platitude: that it is entitled to discovery to dispute Plaintiffs' basic contention that infringement is harmful. This general assertion cannot support the wide-ranging discovery ResearchGate seeks. Plaintiffs seek statutory damages in this case, not actual damages. In Section 504 of the Copyright Act, Congress drew a plain distinction between actual and statutory damages, making it clear that an award of statutory damages does not depend on the demonstration of actual damages. *See* 17 U.S.C. § 504. Congress created the statutory damages remedy to address situations "when no actual damages are proven, or they are difficult to calculate." *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1126 (2d Cir. 1989). Statutory damages are thus available even for "uninjurious and unprofitable invasions of copyright." *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233 (1952).

Plaintiffs acknowledge that, even where a plaintiff seeks statutory damages, some actual damages discovery can be appropriate because a plaintiff's actual damages may be among the factors a jury considers when awarding statutory damages. But, for the reasons discussed above, the journal P&Ls ResearchGate seeks are not relevant to Plaintiffs' actual damages for infringement of the PJAs at issue because the journal P&Ls are too attenuated from the value of the PJAs at issue in the case.

In proposing a stipulation to try to avoid this discovery dispute, Plaintiffs explained that they would agree not to offer any general or specific calculation of actual damages at trial. However, ResearchGate insisted that Plaintiffs must further agree not to offer any evidence or argument that the infringing activity poses *any kind of harm* whatsoever. ResearchGate's position is unreasonable: infringement is an unauthorized exercise of a protected right, without compensation; and that is harmful. Plaintiffs can contend that the infringing activity is harmful, while acknowledging that actual damages are unquantifiable. Indeed, Congress adopted the statutory damages scheme precisely to allow recovery where actual damages cannot be readily determined.

### B. Plaintiffs' actions in response to infringement on other third-party websites are not relevant to ResearchGate's infringement.

As to the works in suit, ResearchGate demands: *all* takedown notices to third parties (RFP No. 27); documents sufficient to show *all* assertions of copyright infringement (RFP No. 36); and

finally, *all* documents regarding unauthorized distributions for which Plaintiffs did not take any enforcement action (RFP No. 17).  Plaintiffs have rightly objected.

ResearchGate treats takedown notices and legal claims as if they were fungible; they are not. Takedown notices sent to or legal claims asserted against *other* parties at *other* points in time based on *other* circumstances can reveal nothing useful for this case.  A takedown notice to some other website says nothing about who posted the unauthorized copy of the PJA, the length of time it was there, the number of distributions, that site's involvement in the copying, or anything else.  All of these concerns apply equally to ResearchGate's apparent demand for documents regarding unauthorized distributions (however defined) that did not result in takedown notices or legal claims; many of these documents are also likely privileged.  Despite ResearchGate's summary assertions, none of these documents or information can speak to ResearchGate's "state of mind," any alleged "copyright misuse," or Plaintiffs' actual damages.

ResearchGate's argument concerning red-flag knowledge under the DMCA is similarly misguided.  ResearchGate is a sophisticated party that knew exactly what it was doing. ResearchGate contends this discovery is relevant, however, to show what "a reasonable person in ResearchGate's position" would do or know.  But none of the discovery that ResearchGate seeks addresses a party "in ResearchGate's position," as other targets of takedown notices or legal claims are likely not similarly situated.  Nor does the requested discovery provide even a glimpse into the activities of a third party that received a takedown notice or legal claim.

Finally, to the extent that ResearchGate seeks documents that even exist, Plaintiffs do not store those documents in such a way that would allow Plaintiffs to search them by work.  The requested discovery is unduly burdensome.

### C.  ResearchGate's putative copyright misuse defense cannot justify the discovery ResearchGate seeks

The smorgasbord of discovery discussed in the remainder of the Letter and that ResearchGate seeks for its fifteenth affirmative defense, copyright misuse, is an unwarranted fishing expedition.  As the cases ResearchGate cites demonstrate, the copyright misuse doctrine is applied sparingly and requires exceptional facts.[1]  Here, ResearchGate proceeds based on vague imagined hypotheticals, not facts.

The Fourth Circuit was the first federal circuit to recognize copyright misuse as a defense.  In *Lasercomb America, Inc. v. Reynolds*, a software manufacturer-plaintiff required all its licensees to contractually agree not to develop competing software for a period of 99 years.  911 F.2d 970, 979 (4th Cir. 1990).  The Fourth Circuit concluded that such an arrangement was an "egregious" anticompetitive restraint amounting to copyright misuse because it required the licensee to "forego utilization of the creative abilities of all its officers, directors and employees" to produce

---

[1] ResearchGate's Answer is a scattershot pleading that raises seventeen affirmative defenses. (ECF No. 9.)  Some refer to multiple doctrines, *see, e.g.*, No. 3 (First Amendment and/or Fair use), such that the actual total number of affirmative defenses exceeds twenty.  ResearchGate has not pled a single fact in support of this laundry list.

a competing software product and allowed the plaintiff to exploit its copyright "to control competition in an area outside the copyright." *Id.* at 978-79.

In *PRC Realty System, Inc. v. Nat. Association of Realtors*, the Fourth Circuit encountered "an even more restrictive[] and anticompetitive result" than in *Lasercomb*. 972 F.2d 341 (table), 1992 WL 183682, at *12 (4th Cir. 1992). Accordingly, copyright misuse applied because the plaintiff's license to its online information system included certain "best efforts" promises that "would effectively preclude production of any system which would serve to undermine [the plaintiff's] publishing business." *Id.*

In *Serv. & Training, Inc. v. Data Gen. Corp.*, the Fourth Circuit rejected application of the copyright misuse defense where no such extraordinary facts existed. The defendant argued that the plaintiff's software license requiring the licensee to use the plaintiff for computer repair services amounted to misuse, but the Fourth Circuit concluded that "[defendants] have offered no evidence that [the plaintiff] did anything beyond . . . activity that is protected as an exclusive right of a copyright owner." 963 F.2d 680, 690 (4th Cir. 1992).

In *Costar Grp. Inc. v. Loopnet, Inc.*, the defendant alleged copyright misuse on the basis that the plaintiff's license restricted licensees from distributing the entire licensed database, as opposed to only those elements over which the plaintiff claimed ownership. 164 F. Supp. 2d 688, 709 (D. Md.), *aff'd on other grounds*, 373 F.3d 544 (4th Cir. 2001). The court rejected the copyright misuse defense, stating that the "misuse defense is only applied in situations that are sufficiently abusive of copyright's grant of exclusivity," and noting the facts' dissimilarity to *Lasercomb*. *Id.* at 708-09.

Finally, in *Microsoft Corp. v. Computer Support Servs. of Carolina, Inc.*, the Court reviewed the misuse caselaw and found that courts reject the misuse defense "where the copyright owner did not prohibit its licensees from either using or independently developing a competing product . . . ." 123 F. Supp. 2d 945, 955 (W.D.N.C. 2000) (granting summary judgment for plaintiff on misuse defense).

As explained below, this case involves no exceptional circumstances to support a copyright misuse defense. Peeling through the rhetoric, it is clear that ResearchGate has no facts whatsoever to support the copyright misuse defense—let alone the exceptional facts required.

>    **1.    The discovery ResearchGate seeks regarding the Coalition for Responsible Sharing is neither relevant nor proportional.**

ResearchGate seeks "all documents and communications" relating to the Coalition for Responsible Sharing. (RFP. No. 35.) ResearchGate further seeks "all documents and communications" relating to: Plaintiffs' "understanding, endorsement, or participation" in certain public statements by the Coalition (RFP Nos. 44-45); and Plaintiffs' position that they "do not have a dispute with the individual researchers." (RFP No. 46.) The arguments that ResearchGate puts forward in an attempt to justify this sweeping discovery are baseless.

The "coordinated activities" and "targeting" that ResearchGate complains of are *takedown notices and litigation* asserting claims of copyright infringement.  (Letter at 3.)  The Coalition is comprised of a variety of world-renowned businesses, publishers, societies, and non-profit organizations.  They have sent takedown notices to ResearchGate identifying unauthorized copies of PJAs on its social network / file sharing website.  Two members of the Coalition (Plaintiffs) have also brought suit against ResearchGate.  The Coalition has a website where it explains these actions to the research and scientific community.  None of this—all public-facing and undisputed—justifies ResearchGate's requested discovery.  As the Ninth Circuit has recognized, "plaintiffs who sought to enjoin unlicensed use of copyrighted works were entitled to do so because they were not seeking to extend a copyright monopoly to other products or works."  *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1157 (9th Cir. 2011).  Further, Plaintiffs are entitled to enforce their rights collectively.  As one court in this district has held, "[e]ven if the Court accepted that [the plaintiff] was collectively enforcing its copyrights with other [similarly situated competitors], that would not, alone, amount to copyright misuse."  *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 711-12 (D. Md. 2012).

ResearchGate has failed to allege *any* facts to support its wild accusation that Plaintiffs are attempting to control preprints (or other content) outside the scope of their copyright interests.  ResearchGate is unable to identify any such facts because the takedown notices from Coalition members and Plaintiffs' claims in this suit allege infringement solely by copying PJAs.  *See, e.g.*, Compl. ¶¶ 3-6, 22, 24-46 (ECF No. 1).  Accordingly, courts have denied discovery into misuse allegations in virtually identical circumstances.  *Preferred Carolinas Realty, Inc. v. Am. Home Realty Network, Inc.*, No. 1:13CV181, 2014 WL 1320133, at *5-*6 (M.D.N.C. Mar. 28, 2014) (denying as an "unwarranted burden" discovery into misuse allegation that "[p]laintiff is misusing copyrights in concert with others to prevent competition"); *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453 (S.D.N.Y. 2007) (denying discovery into misuse as prejudicial to plaintiffs and holding that "[d]efendant . . . has not cited a single case finding that even remotely similar facts constituted copyright misuse, nor has she alleged any viable anticompetitive aspects of the plaintiffs' agreement to collectively bring infringement suits.").

ResearchGate's argument regarding Mendeley makes even less sense.  ResearchGate fails to explain why the other Coalition members would enforce their copyrights in order to help Elsevier protect its own reference manager and academic social network.

Throwing more spaghetti at the wall, ResearchGate tries to justify its copyright misuse discovery by contending the Coalition's purpose is "to convince ResearchGate to forgo entirely the notice-and-takedown regime under the DMCA."  ResearchGate then insists this is against "clear public policy" and interferes with its "undisputed right[]" to resolve claims via take-down notices.  ResearchGate is wrong, on several levels.

First, ResearchGate misleadingly provides the Court with just an excerpt from one of the Coalition's public statements.  As the complete paragraph of that statement shows, the Coalition explained that it is the massive scale of ResearchGate's ongoing infringement that renders takedown notices an ineffective long-term solution:

In rejecting all of these collaborative solutions, ResearchGate has insisted that publishers instead issue millions of takedown notices for unauthorized content on its site now and in the future.  While the Coalition for Responsible Sharing has now no other option but to take this route, we firmly believe that it is not a viable long-term solution, *given the current and future scale of infringement*.  Sending large numbers of takedown notices *on an ongoing basis will prove highly disruptive to the research community*.

*Publishers and Societies Take Action Against ResearchGate's Copyright Infringements*, Coalition for Responsible Sharing, http://www.responsiblesharing.org/coalition-statement/ (last visited Feb. 24, 2020) (emphasis added).  Nothing in this statement suggests that the Coalition is exploiting copyright "to control competition in an area outside the copyright."  *Lasercomb*, 911 F.2d at 979.  Rather, the Coalition merely laments the scale of the infringing activity and the commensurate disruption that takedown notices pose to the research community.

Second, the context makes clear that ResearchGate's argument is at war with the facts and law.  The full statement confirms that Coalition members *are* issuing takedown notices.  Plaintiffs have sued ResearchGate, as is their right, but they have also continued to send it takedown notices.  Moreover, the DMCA's notice-and-takedown procedures are not mandatory.  A copyright owner may send a notice, but it is not obligated to do so.  Likewise, an online service provider is not obligated to respond expeditiously to notices, as required by the DMCA, unless it seeks to qualify for the DMCA safe harbor.  17 U.S.C. § 512(c).

Finally, ResearchGate's argument that the Coalition is attempting to convince ResearchGate to forego the DMCA safe harbor puts the cart before the horse by assuming that that ResearchGate is entitled to the safe harbor's protection in the first place.  But ResearchGate is not the trier of fact on whether it receives protection under the safe harbor.  ResearchGate receives no DMCA safe harbor protection if it is found liable as a direct infringer.  17 U.S.C. § 512(c) (limiting safe harbor protection only to "infringement of copyright by reason of the storage at the direction of a user").  ResearchGate's deep involvement in ginning up the infringement on its site and inducing and influencing others' infringing activity also preclude any safe harbor protection.  17 U.S.C. § 512(c)(1)(A) and (B).  Accordingly, Plaintiffs' assertion that DMCA takedowns are not a viable long-term solution have substantial grounds and cannot plausibly be viewed as an attempt "to control competition in an area outside the copyright."  *Lasercomb*, 911 F.2d at 979.

Pivoting, ResearchGate argues that Coalition-related documents are relevant to its DMCA defense and to damages.  These arguments are frivolous.  ResearchGate postulates a scenario where, despite sending takedown notices and initiating litigation, there are secret Coalition documents indicating that ResearchGate's activities are not infringement, but ResearchGate gives no reason to think such documents exist.  Against that backdrop, ResearchGate asserts that those documents "would demonstrate that ResearchGate could not have been aware of facts that, to a reasonable person, would have made it obvious to ResearchGate that its activities infringed Plaintiffs' copyrights."  (Letter at 3.)  ResearchGate argues that those documents relate to its "state of mind."  But it fails to make clear how secret documents it never saw could affect its state of mind.  The same is true for the "reasonable person."

**2. Other documents ResearchGate seeks supposedly related to copyright misuse are neither relevant nor proportional.**

ResearchGate's other RFPs that seek other documents purportedly related to copyright misuse fare no better.  In RFP No. 47, ResearchGate seeks "[a]ll documents and communications regarding how you understand your inbound licenses to impact material outside the copyright (i.e., outside the scope of the exclusive rights granted by copyright law)—including changes suggested by third parties during peer review, document formatting, and underlying facts, data, and research—contained within the PJAs."  RFP No. 48 seeks "[a]ll documents and communications relating to your attempt to use your inbound licenses to prevent named authors from making modifications to their preprints."  RFP No. 49 seeks "documents and communications sufficient to show your understanding of the copyrightable material within a preprint, postprint, approved manuscript, and PJA, including your understanding of the similarities and differences in copyrightable material contained in each of these categories of works."

As Plaintiffs have explained in a meet-and-confer call spanning several days, these requests are vague, convoluted, and veer far from what this lawsuit is about: the PJAs that have been copied and distributed without authorization.  Plaintiffs have already produced their copyright transfer agreements (what ResearchGate calls "inbound licenses") with authors for the PJAs.  Those agreements address Plaintiffs' relationships with these authors.  Plaintiffs have also produced their sharing policies and other educational materials regarding those policies.  Going additional layers, whatever that might be, is unwarranted.  For this request and others, documents do not become relevant merely because ResearchGate speculates that they might reveal something that it wishes to see.  ResearchGate's Letter fails to adduce any facts demonstrating the likely relevance and proportionality of these requests, and ResearchGate's motion should therefore be denied.  *Cf. Coach, Inc. v. Kmart Corps.*, 756 F. Supp. 2d 421, 429 (S.D.N.Y. 2010) (striking misuse defense where defendant had not pled any facts in support of the defense and, as a result, "Plaintiffs would needlessly incur increased discovery costs" as "a copyright misuse defense could greatly expand the scope of discovery. . . .").

Searching for the documents that ResearchGate seeks under the guise of "copyright misuse" is an unnecessary, disproportionate burden for Plaintiffs.  Relevance grounds alone dispose of ResearchGate's demands.  But, as can be explained further in declarations if necessary, ResearchGate's demands also present substantial burdens.  The requests are extremely broad and would also involve significant privilege review.  In light of the minimal relevance of the requests, no such burdens can be proportionate and justified.

Respectfully submitted,

*/s/ Scott A. Zebrak*

Scott A. Zebrak

cc:  Counsel of Record (via ECF)